**LEASING SERVICE CORPORATION,**
**Plaintiff,**

v.

**CARBONEX, INC., Defendant.**

**No. 80 Civ. 5684 (WCC).**

United States District Court,
S. D. New York.

April 15, 1981.

254

Sol D. Bromberg, New York City, for plaintiff.

Trimble, Stapleton, Reaves & Slone, Lexington, Ky., for defendant; Harold G. Slone, Lexington, Ky., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action is before the Court on the motion of plaintiff Leasing Service Corporation for summary judgment pursuant to Rule 56, F.R.Civ.P. Defendant Carbonex, Inc. ("Carbonex") filed an answer to the complaint but has not filed any affidavits, answering papers or other response to plaintiff's motion. Thus, under Rule 56(c) and (e) and Local Rule 3(g), the facts set forth in plaintiff's affidavit, Rule 3(g) Statement and documentary submissions are deemed admitted and plaintiff is entitled to the relief it seeks if its claims are good as a matter of law.

*Background*

Plaintiff is a New York financing corporation with its principal place of business in New York. Carbonex, a Delaware corporation, operates a coal mine in Kentucky. In the course of its operation, Carbonex leased certain heavy mining equipment. Four such equipment leases are at issue here.

The first lease, dated September 19, 1979, between Carbonex and Miller & Miller, Auctioneers, covers thirteen pieces of equipment, primarily "tractor dozers" and "wheel loaders." The lease indicates that Miller & Miller intended to assign their rights to plaintiff, and Miller & Miller did subsequently make such an assignment. The lease covers total payments of $1,094,280, to

be made, after an initial advance payment of $97,000, in twenty-three equal monthly installments of $43,360 beginning on October 25, 1979. It does not include a purchase option at the end of the term of the lease, but rather states that "[t]itle to equipment shall at all times remain in lessor." It further recites that:

"In any jurisdiction where the Uniform Commercial Code is in effect Lessee grants to Lessor a security interest in the Equipment ... and agrees that any security interest created by this agreement secures any and all obligations of lessee at any time owing to Lessor, now existing and/or hereafter incurred.

\* \* \* \* \* \*

"If Lessee fails to pay any rent ... when due or fails to pay when due any [other] indebtedness to Lessor ... then Lessor may, without notice or demand, declare the entire amount of rent then unpaid ... together with delinquency charges, collection charges and attorneys' fees and all other sums owing to Lessor by Lessee ... immediately due and payable ... and Lessor may, at its option and without notice ..., to the extent permitted by law: (1) recover the Balance; (2) take possession of the Equipment wherever same may be located ... and (a) retain Equipment and all prior payments of rent; or (b) retain all prior payments and either (i) sell Equipment at public or private sale ... applying any net proceeds less 15% of Total Rent to all charges and expenses incurred by Lessor in connection with or incidental to the retaking ... and sale, including attorneys' fees, then to the Balance and then to any other amounts owing by Lessee to Lessor; or (ii) retain Equipment and credit Lessee with the reasonable re-leasing value of the Equipment; Lessee remaining in any event liable for any deficiency."

The agreement additionally provides that Carbonex agrees to pay expenses of collection and reasonable attorneys' fees "no less than 20% of any amount sought," agrees to submit to the jurisdiction of any court lo-

cated in the state of New York, agrees that venue is properly laid in any such court, and agrees to pay a delinquency charge on any unpaid rent or other sum due under the contract and not paid of $\frac{1}{15}$ of 1% per day "from the date when such payment was due until paid." Finally, the agreement contains a flexibly broad choice of law clause: "[i]ntending that each and every provision of this agreement be fully effective according to its terms, the parties hereto specifically agree that the validity, enforceability and effectiveness of each provision shall be determined by the law of the state of residence or principal place of business of lessee or lessor ... whichever may render each such provision effective."

The next three leases, substantially identical in terms, are between Carbonex and plaintiff directly. The first of these leases, dated October 11, 1979, covering lease of a Caterpillar Model 988 Rubber Tired Loader, provides for payment of a total rent of $34,252 for a term of 23 months commencing on October 11, 1979. The next, dated November 26, 1979, covering the same model number Caterpillar "Wheel Loader," provides for payment of a total rent of $90,454 in equal monthly installments of $3,479 for 26 months starting on November 26, 1979. The third, dated January 21, 1980, a lease of a truck drill mounted on a crane carrier, is for a total rent of $199,394 over a term of 26 months starting on January 21, 1980. Each lease provides, in relevant part:

"In any jurisdiction where the Uniform Commercial Code is in effect Lessee grants to Lessor a security interest in any ... equipment ... in which Lessee has any interest and agrees that any security interest created by this agreement secures any and all obligations of Lessee ... to Lessor ....

\* \* \* \* \* \*

"Should Lessee fail to pay when due any part of the rent ... or any other sum required to be paid to Lessor by Lessee, Lessee shall pay to Lessor a late charge of $\frac{1}{15}$th of 1% per day on such delinquent payment ... from the date when such payment was due until paid, and ex-

penses of collection, including attorneys' fees.

    *    *    *    *    *    *

"If Lessee fails to pay rent or other amount herein provided when due . . . then . . . the full amount of Total Rent then unpaid hereunder and all other obligations of Lessee to Lessor shall become due and payable forthwith . . . and Lessor may, at its option: . . . without notice or demand and without legal process, take possession of equipment . . . (but Lessee shall not be released from its obligations under this agreement until the full amount of unpaid Total Rent and all other sums payable hereunder have been paid in full) and Lessor may retain all payments of rent and (i) retain the equipment; or (ii) sell the equipment (applying net proceeds of such sale less 20% of the Actual Cost to the unpaid balance of Total Rent); or (iii) retain equipment and attempt release of same . . . ; Lessee remaining unconditionally liable for any deficiency under (ii) and (iii) above.

    *    *    *    *    *    *

"[the] parties . . . do hereby agree to the venue and jurisdiction of any court in the state and County of New York regarding any matter arising hereunder."

Attorneys' fees are agreed to in an amount of 15% of amounts due.

Between April and July of 1980, Carbonex failed to make payments due, in default of its lease obligations, under each of these agreements. Plaintiff scheduled a public sale of the equipment leased under the four leases at the premises of Rich Equipment Company in Louisville, Kentucky, for August 15, 1980. Plaintiff sent a copy of the notice of this sale to Carbonex by certified mail. The sale was advertised in the Louisville Courier Journal Times on August 10, 12 and 14, in the Lexington Herald Leader on August 10, 12 and 14, and in the Contractors' Hotline Daily on August 5, 1980. Plaintiff also sent copies of the notice of sale to twenty-six potential purchasers who plaintiff believed might be interested in the equipment. At the sale, plaintiff was the highest bidder for all of the equipment leased under the September 19, 1979 contract except a Sun Light Plant with serial number 1064 which was purchased by a third party; plaintiff also bid in for the equipment covered by the November 26 lease. The equipment covered by the January 21, 1980 lease was subsequently sold to third parties at a private sale for an amount which plaintiff's uncontroverted Rule 3(g) statement indicates was greater than the price the equipment would have brought at auction. The equipment covered by the contract of October 11, 1979 was repossessed by plaintiff but destroyed by fire.

Plaintiff now seeks to recover the following amounts:

1. On the September 19, 1979 contract, based on payments received of $400,520, and a default date of May 25, 1980,

SCHEDULE 1

| | | | |
|---|---|---|---|
| I. | A. | Unpaid Card Balance to date of Default 5/25/80 | $ 692,605.00 |
| | B. | L/C's at 1/15 of 1% on payments paid through 4/25/80 | –– |
| | C. | L/C's on unpaid card balance (A) at 1/15 of 1% from 5/25/80 to Auction Date 8/15/80 | 37,862.36 (82 × .01/ 15 × 692,605.) |
| | | Unpaid Sales/Use Tax | 34,630.25 |
| | | Balance Due at Date of Auction | $ 765,097.61 |
| II. | | Gross Auction Proceeds | 296,800.00 |
| | | Less: Costs of Repossession and Sale: | |
| | | Lien Search $ 106.76 | |
| | | Advertising 78.06 | |

| | |
|---|---:|
| Freight | 30,250.00 |
| Travel Expenses | 200.00 |
| Storage | – – |
| Repairs | – – |
| Total Cost | $30,634.82 |

| | | |
|---|---|---:|
| Balance of Auction Proceeds _ _ _ _ _ _ _ _ _ _ _ _ _ _ | $ | 266,165.18 |
| Less: 15% of total rent (see terms of Lease) | | 164,142.00 |
| Net Auction Proceeds | | 102,023.18 |

III. Deficiency _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    $ 663,074.43

| | |
|---|---:|
| Interest from 8/15/80 to 3/31/81 at 6% per annum (228 days at $109 per diem) | 24,852.00 |
| Plus Attorney's Fees (20%) on $663,074.43 | 132,614.88 |
| TOTAL DEFICIENCY | $ 820,541.31 |

2. On the November 26, 1979 contract, based on payments received of $20,874 and a default date of June 17, 1980,

## SCHEDULE 2

| | | | |
|---|---|---|---:|
| I. | A. | Unpaid Card Balance to date of Default 6/17/80 | $69,580.00 |
| | B. | L/C's at 1/15 of 1% on payments paid through 5/17/80 | – – |
| | C. | L/C's on unpaid card balance (A) at 1/15 of 1% from 6/17/80 to Auction Date 8/15/80 | 2,736.81 (59 × .01/ 15 × 69,580.) |
| | D. | Unpaid Sales/Use Tax | 3,479.00 |

Balance Due at Date of Auction    $75,795.01

II. Gross Auction Proceeds    30,000.00

Less: Costs of Repossession and Sale:

| | |
|---|---:|
| Lien Search | $ 106.76 |
| Advertising | 78.06 |
| Freight | 2,500.00 |
| Travel Expenses | 200.00 |
| Storage | – – |
| Repairs | – – |
| Total Cost | $2,884.82 |

| | |
|---|---:|
| Balance of Auction Proceeds _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 27,115.18 |
| Less: 20% of initial cost of equipment (see terms of Lease) ($75,000 prior sale) | 15,000.00 |
| Net Auction Proceeds | 12,115.18 |

III. Deficiency _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    $63,680.63

| | |
|---|---:|
| Interest from 8/15/80 to 3/31/81 at 6% per annum (228 days at $10.42 per diem) | 2,375.76 |
| Plus Attorney's Fees (15%) (of $63,680.63) | 9,552.09 |
| TOTAL DEFICIENCY | $75,608.48 |

3. On the January 21 contract, based on payments received of $38,345 and a default date of May 22, 1980,

SCHEDULE 3

| | | | |
|---|---|---|---|
| I. | A. | Unpaid Card Balance to date of Default 5/22/80 | $161,049.00 |
| | B. | L/C's at 1/15 of 1% on payments paid through 4/22/80 | — — |
| | C. | L/C's on unpaid card balance (A) at 1/15 of 1% from 5/22/80 to Auction Date 8/15/80 | 9,126.10 (85 × .01/ 15 × 161,049.) |
| | D. | Unpaid Sales/Use Tax | 8,052.45 |
| | | Balance Due at Date of Auction | $178,227.55 |

| | | |
|---|---|---|
| II. | Gross Auction Proceeds (private sale) | 84,000.00 |

Less: Costs of Repossession and Sale:

| | |
|---|---|
| Lien Search | $ 106.76 |
| Advertising | 78.06 |
| Freight | 2,500.00 |
| Travel Expenses | 200.00 |
| Storage | — — |
| Repairs | — — |
| Total Cost | $2,884.82 |

| | |
|---|---|
| Balance of Auction Proceeds _ _ _ _ _ _ _ _ _ _ _ _ _ | 81,115.18 |
| Less: 20% of initial cost of equipment (see terms of Lease) ($80,000 prior sale) | 16,000.00 |
| Net Auction Proceeds | 65,115.18 |

| | | |
|---|---|---|
| III. | Deficiency _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | $113,112.27 |
| | Interest from 8/15/80 to 3/31/81 at 6% per annum (at $18.59 per diem 228 days) | 238.52 |
| | Plus Attorney's Fees (15%) on $113,112.27 | 16,966.84 |
| | TOTAL DEFICIENCY | $134,317.63 |

As to the October 11, 1980 contract, plaintiff's Rule 3(g) statement explains that the equipment repossessed was destroyed by fire and that settlement negotiations with the insurance company, completed during the pendency of this motion, resulted in plaintiff's receipt of a sum slightly in excess of the amount which plaintiff calculated that Carbonex owed under the lease. Plaintiff's amended Rule 3(g) statement thus states that plaintiff will not pursue this cause of action and will credit defendant with the insurance proceeds surplus plus any salvage value realized on the equipment.

Carbonex raises two affirmative defenses in its answer: that the transaction should be treated as an installment sale, rather than a lease; and that the equipment repossessed by plaintiff was not sold in a commercially reasonable manner.

*Discussion*

■ Assuming, most favorably to Carbonex, that the transaction here falls under Article 9 of the Uniform Commercial Code, see N.Y.U.C.C. §§ 1–201(37) and 9–102 (conditional sale; lease intended as security), so

that the protections of Sections 9–504 [1] and 9–507 [2] covering disposition of collateral following repossession of that collateral by a secured party apply here, it appears that plaintiff is entitled to judgment in its favor as a matter of law as to the majority of the sums it seeks here. The manner in which the sales of equipment leased under the first three contracts were advertised was commercially reasonable, see *Credit Alliance v. B & P Excavating*, 80 Civ. 2649 (CSH) (S.D.N.Y., filed February 27, 1981); *Credit Alliance v. David O. Crump Sand & Fill*, 470 F.Supp. 489 (S.D.N.Y.1979). The fact that Leasing Service was the highest bidder on all items sold at the public sale except the second Sun Light Plant and the equipment leased under the January 21 contract does not make the sale unreasonable, see U.C.C. § 9–504(3). Defendant has made no specific complaint regarding the private sale of the January 21 contract equipment, and plaintiff has indicated by affidavit that the sum gained was in excess of the then-current market price for such equipment. The late charges agreed to by defendant under the leases have been approved in

---

**1.** Section 9–504 provides, in relevant part:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. ... The proceeds of disposition shall be applied in the order following to

"(a) the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;

"(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

"(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed, but only to the extent of the proceeds undistributed when such notification is received. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, file with the secured party a sufficient indemnity bond, and satisfy any other reasonable requirements imposed by the secured party, and unless he does so, the secured party need not comply with his demand.

"(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

**2.** Section 9–507 provides, in relevant part:

"(1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part.

\* \* \* \* \* \*

"(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner."

previous cases as not unduly overreaching or unreasonable, see *B & P Excavating, supra,* and taken alone, do not appear unconscionable under the circumstances here, see *Crump, supra*; U.C.C. § 2–302.

■ Two additional lease terms sought to be enforced by plaintiff, however—the deduction of 15% of the total rent on the September 19 agreement or 20% of the initial cost of the equipment in the later contracts from the amount credited to Carbonex from the sale of the equipment, and the charges of 15 or 20% of amounts owing for attorneys' fees—raise questions of unconscionability as a matter of law, see *Crump, supra,* 470 F.Supp. at 495. As to attorneys' fees, while terms of a conditional sale contract drafted by plaintiff setting similarly high percentages of recovery as attorneys' fees have been approved, see *B & P Excavating, supra,* that approval was for a sum of $13,000 in a case where there had been extensive motion practice. Here, plaintiff, who has done no more than file a complaint and one unopposed summary judgment motion, seeks attorneys' fees of $159,133.81, an amount which, in the circumstances, seems wholly unrelated to the work involved and oppressively high.

■ The 15 or 20% of initial cost deductions from the proceeds of the sales of equipment repossessed, which, plaintiff's affidavit explains, is to compensate plaintiff for the value of the equipment at the end of the term of the lease, are troubling for two reasons. First, the justification for such deductions rests on the characterization of these transactions as true leases, rather than as leases "intended for security" equivalent to conditional sales agreements. This characterization is inconsistent with the overall appearance of these transactions. Carbonex is required by each agreement to pay sales tax. The total amounts to be paid for the equipment are high in relation to the equipment's stated value: on the November 26 lease, for equipment which plaintiff indicates had an initial value of $75,000, Carbonex was to pay $90,454 over 26 months; on the January 21 contract, Carbonex was to pay $199,394 over 26

months for equipment valued at the contract date at $80,000, an excess of $15,000 and $120,000, respectively, over the stated value of the equipment. This second price, in particular, appears more equivalent to a sale rather than a rental price, especially when plaintiff's estimate that the equipment would be worth only 20% of its pre-lease value at the end of the term of these 23- to 26-month leases suggests that the equipment had less than three years' useful life remaining when transferred to Carbonex and less than one year's useful life remaining when the lease terms were up, so that Leasing Service may not ever have contemplated repossessing the equipment at the close of the lease term. Second, even if the Court accepts the agreements at face value as leases, the monetary bases from which the 15 or 20% deductions are calculated—the total rent on the first lease or the "initial cost" of the equipment on the November 26 and January 21 leases—as well as the amount of proceeds received on the sale of equipment are all amounts determined solely by plaintiff, and plaintiff has offered no independent basis from which the Court could conclude that the deducted amounts are any better than speculative estimates of the open market value of the equipment at the end of the lease term, and thus, that the deduction requested is not unduly oppressive.

The Court concludes that the attorneys' fees demanded are, as a matter of law, unconscionably high, and that plaintiff has failed to create a record sufficient to rule out issues of fact on the unconscionability of the 15–20% deductions from sale proceeds credited to defendant to cover the remaining value of the equipment described in these agreements. If plaintiff wishes to pursue its claim for attorneys' fees or the 15–20% deductions from sale proceeds, plaintiff is directed to submit within five days an amended Rule 3(g) statement setting forth its attorney's usual hourly billing rate and the hours of legal time spent and other costs incurred in preparation and filing of this action and this motion, and detailing the commercial background to this

transaction, the relative economic position of plaintiff and defendant, the market value of similar types of equipment at the time of the making of these leases and of the August 15 sale, and any other information which plaintiff deems relevant to the issue of the characterization of the agreement as equivalent to a conditional sale and thus of the fairness of the 15–20% deduction. Otherwise, plaintiff shall submit a proposed judgment on five days' notice covering the unpaid balances, sales tax and late charges minus gross auction proceeds as reduced by costs of repossession on the first three causes of action, and a voluntary dismissal as to the fourth cause of action.

SO ORDERED.