**In re SACKMAN MORTGAGE CORPORATION, Debtor.**

**EUROPEAN AMERICAN BANK, Plaintiff,**

v.

**SACKMAN MORTGAGE CORPORATION, Defendant.**

**Bankruptcy No. 91 B–12185(TLB). Adv. No. 91–6025–A.**

United States Bankruptcy Court, S.D. New York.

Aug. 26, 1993.

Sherman, Citron & Karasik by Michael Wexelbaum, New York City, for debtor.

Schulte Roth & Zabel, by Mark A. Neporent, New York City, for European American Bank.

### DECISION ON MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Bankruptcy Judge.

Outraged by the debtor's refusal to admit the regularity and validity of the foreclosure sale which European American Bank ("EAB") conducted exactly ten minutes before the debtor filed its chapter 11 petition, EAB commenced an adversary proceeding to declare that it is the owner of the foreclosed property, to enjoin the debtor, pursuant to 11 U.S.C. § 105, from interfering with EAB's enjoyment of that property, and for damages. By virtue of the foreclosure, EAB became the ostensible mortgagee of a particular income-producing building. In response to EAB's notice to the tenants in that building to pay their rent directly to EAB, the debtor notified the tenants that, in its opinion, EAB's foreclosure was improper. It is alleged, not too surprisingly, that the tenants declined to deliver their rent checks to EAB. To remedy this perceived injustice, EAB commenced this suit. It now moves for summary judgment pursuant to Fed.R.Civ.P. 56 and Fed.R.Bankr.P. 7056 against Sackman Mortgage Corporation ("SMC"), the debtor.

SMC contends that the foreclosure sale was neither "commercially reasonable" pursuant to the New York Uniform Commercial Code ("N.Y.U.C.C.") § 9–504 nor an exchange for reasonably equivalent value pursuant to 11 U.S.C. § 548(a)(2)(A). Central to these defenses is SMC's argument that the so-called participation agreement by which EAB acquired its alleged senior participation in certain notes secured by the mortgage on the realty was not a participation agreement at all, but, rather, a secured loan to SMC. Alternatively, SMC claims the notice of the foreclosure sale was insufficient under New York's Real Property Actions and Proceedings Law ("RPAPL") § 231.

### I.

Three transactions underlie this motion. The facts are somewhat convoluted but must be laid out for a proper understanding of this decision. For ease of reference we will call the first series of actions the "1986 Transaction." Late that year, SMC, which is a mortgage lender, lent $1.38 million to Kurt J. Wittek and another $4.12 million to a partnership, YPH Associates ("YPH"), of which Wittek is a general partner. Wittek executed a note to SMC in the principal amount of the loan to him. YPH, in December, 1986, assumed this note and its correlative mortgage on a piece of property in Yonkers, New York. YPH also executed a note in conjunction with the $4.12 million which it had borrowed as well as a mortgage on the same property in Yonkers. When all was said and done, YPH, through the two notes (the "YPH

Notes"), was indebted to SMC in the aggregate amount of $5.5 million; by virtue of the two recorded mortgages and assignments of leases and rents, the Yonkers property and the rents which the property generated stood as security for the debt.

The next fall, SMC and EAB entered into a Construction Loan Participation Agreement (the "1987 Transaction") pursuant to which EAB now argues that it purchased a $4 million senior participation in the YPH Notes and the mortgages securing them. As detailed below, although the existence of the 1987 Transaction is not disputed, the parties do dispute whether the agreement which they executed was a "true" participation agreement or a secured loan.

On May 16, 1989, YPH also executed a subordinated promissory note (the "Subordinated Note") in favor of SMC in the principal amount of $3 million, representing an additional loan by the debtor to YPH. This Subordinated Note was secured by an unrecorded mortgage on the Yonkers property.

As part and parcel of restructuring efforts concerning SMC's outstanding obligations to EAB, on December 29, 1989, SMC and EAB entered into yet another series of transactions (the "1989 Transaction"). SMC executed two notes in favor of EAB: an amended and restated note (the "SMC Note") and an interest reserve note (the "Interest Note").[1] They also entered into two agreements. First, SMC granted a security interest in and assigned to EAB (the "Pledge Agreement") all of SMC's rights in and to mortgages and other loan documents, including the YPH Notes and the Subordinated Note (collectively referred to as the "Collateral"). Second, SMC collaterally assigned to EAB all of its right, title and interest in and to the Collateral (the "Collateral Assignment").

One year later, in December 1990, SMC defaulted under the SMC Note, the Interest Note, the Pledge Agreement and the Collateral Assignment. Thereafter, by letter dated January 25, 1991, EAB notified SMC that it was in default and declared the entire principal of the SMC Note and the Interest Reserve Note, together with all accrued and unpaid interest, due and payable. SMC did not cure the defaults.

Subsequently, EAB notified SMC by a letter dated April 24, 1991, that the Collateral was to be sold by a public sale at 9:00 a.m. on May 14, 1991. On April 26, 29, and 30, EAB provided notice of the sale in one local and two national newspapers.

SMC's president, James F. Hefelfinger, stated in his affidavit that he made a final effort to communicate with EAB in the hope of averting a chapter 11 filing the effect of which would stay automatically the scheduled foreclosure sale. To this end, he says, he spoke with the officer in charge of the loans at EAB, Elizabeth Fisher, and informed her of SMC's intent to file for chapter 11 protection. Hefelfinger claims that Fisher advised him that EAB would not go forward with the sale; she, however, denies giving SMC any reason, at any time after notice of the foreclosure sale was delivered to SMC and published, to believe that serious settlement discussions were underway or that the foreclosure sale would not proceed as scheduled. Fisher also denies ever discussing with Hefelfinger an ·adjournment of the foreclosure sale on the eve of its occurrence.

Ten minutes before the scheduled commencement of the foreclosure sale, EAB's attorneys called SMC's attorneys to advise them that the sale would proceed; the former also denied to the latter a request for an adjournment to allow for a filing of the intended chapter 11 petition. At 9:11 a.m., EAB was awarded the sale of the Collateral. At 9:21 a.m., SMC filed its bankruptcy petition.

## II.

The keystone to this motion is the value of the Collateral purchased at the foreclosure sale, specifically, the value of

---

1. The principal amounts of the notes are $10,234,387.98 and $6,200,000 respectively. The amount currently owed is in dispute. EAB alleges that $12,418,135.36 is owed, while SMC asserts that the specific amount owed need be determined upon trial.

SMC's interest in the YPH Notes. EAB purchased the Collateral for $855,855. SMC contends, among other things, that this amount was not commercially reasonable in light of the value of SMC's interest in the YPH Notes. This contention rests on SMC's argument that the 1987 Transaction was actually a loan rather than a participation agreement. If that be correct, SMC urges, it increased SMC's indebtedness to EAB by $4 million, but did not give EAB a participation interest in the YPH Notes and the Collateral. Thus, SMC contends, it owns a 100% interest in those notes and EAB has only a security interest in them to secure the $4 million loan from EAB to SMC. EAB's calculation that SMC owned only 27.3% of the $5.5 million represented by the face amount of the YPH Notes, a calculation on which EAB's bid was based, is therefore incorrect, according to SMC.

EAB, on the other hand, argues that the 1987 Transaction was a true participation agreement by which it acquired a $4 million senior participation interest in the YPH Notes. As a result, EAB claims, SMC's interest in the YPH Notes is $1.5 million, or 27.3% of the total original indebtedness of $5.5 million. The EAB bid of $855,855 at the foreclosure sale would then be at least 75% of SMC's $1.5 million junior interest.[2]

EAB points to the explicit terms of the participation agreement as proof that it was a true participation. For instance, the agreement is entitled, "Construction Loan Participation Agreement" and includes references such as "participation interest", "sale", and "purchase". The document also states that the parties agree that the interest transferred is a participation. In addition, EAB argues, the bank has always treated the agreement as a participation and refers to the "special instructions" section of its booking instructions for the 1987 Transaction, which states that the docu-

ment is to be booked as a "participation bought".

### III.

A motion for summary judgment shall be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, "[t]he court's responsibility is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992); *Western World Ins. Co., v. Stack Oil, Inc.*, 922 F.2d 118 (2d Cir. 1990); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The burden rests on the moving party to clearly establish the absence of a genuine issue as to any material fact. *Celotex v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

### A. *Participation Agreement or Loan*

A participation agreement is a commonly used financing device for splitting a loan between two or more lenders—the lead lender and the participants. Some of the primary reasons for participation agreements are the allocation of risk for the lead bank, the participant's passive role in negotiations with the borrower, and diversification of a bank's portfolio.

---

**2.** In making this calculation, EAB used an appraisal value of $4.18 million for the Yonkers property securing the YPH Notes. EAB evaluated all the other collateral as worthless, an evaluation also challenged by SMC. SMC's 27.3% share ($1.5 out of $5.5 million outstanding) of collateral valued at $4.18 million is $1.13 million. A bid of $855,855 represents 75% of $1.22 million.

Under a participation agreement, the participant agrees to pay the lead lender for the lead lender's promise to transfer to the participant a like percentage of the underlying loan. In the typical participation, the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (i.e. a *pro rata* share in the principal and interest payments) but also the risk of the borrower's default. The lead lender makes no warranties or guarantees about the borrower's ability to repay the loan or about the worth of the collateral in the event of default. If the borrower does default, the participant is entitled to a *pro rata* share of any monies received upon liquidation of the collateral, but it has no right of recourse against the lead lender. *See,* Threedy, *Loan Participations—Sales or Loans? Or Is That The Question?,* 68 Or.L.Rev. 649 (1989) (referred to subsequently as *Threedy*); Knight, *Loan Participation Agreements: Catching Up With Contract Law,* 3 Colum.Bus.L.Rev. 587 (1987) (subsequently referred to as *Knight*).

Under New York law, the court first looks to the written agreement to discern the parties' intent, limiting its inquiry to the words of the agreement itself so long as the agreement sets forth the parties' intent clearly and unambiguously. *Nicholas Laboratories Ltd. v. Almay, Inc.,* 900 F.2d 19, 20–21 (2d Cir.1990); *Slatt v. Slatt,* 64 N.Y.2d 966, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100 (1985); *see also In re Eastern Systems, Inc.,* 105 B.R. 219, 228 (Bankr.S.D.N.Y.1989), *aff'd,* 1991 WL 90733 (S.D.N.Y.1991). Unless an ambiguity is found and proof of the parties' subjective intent is proffered, the court will not look beyond the four corners of the contract when construing its meaning. *Eastern Systems,* 105 B.R. at 228 (citing *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 248–49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975)). However, merely looking to what the agreement names the transaction is an insufficient basis to support the finding of a participation agreement because, "[s]imply calling transactions 'sales' does not make them so. Labels cannot change the true nature of the underlying transactions." *Fireman's Fund Insurance Companies v. Grover (In re Woodson Co.),* 813 F.2d 266, 272 (9th Cir.1987). It is the economic substance of a transaction that should determine the rights and obligations of interested parties. *Liona Corp., N.V. v. PCH Associates (In re PCH Associates),* 804 F.2d 193, 199 (2d Cir.1986); *All Seasons Resorts Inc. v. Abrams,* 68 N.Y.2d 81, 506 N.Y.S.2d 10, 16, 497 N.E.2d 33 (1986); *Pohatcong Investors, Inc. v. Commissioner of Taxation & Finance,* 156 A.D.2d 791, 549 N.Y.S.2d 211, 213 (3d Dep't 1989); *Pactel Finance v. D.C. Marine Service Corp.,* 136 Misc.2d 194, 518 N.Y.S.2d 317, 318 (Dist.Ct.Nassau Co.1987).

To paraphrase a relatively recent state court decision, in our sophisticated economy transactions are usually shaped to maximize tax benefits. Before deciding rights and obligations the court ought look to the economic realities of the transaction to understand the underlying purpose and goal. Only then can the court affix the label from which rights and obligations flow. *Plaza Operating Partners, Ltd. v. Maison Mendessolle, Ltd.,* 144 Misc.2d 696, 545 N.Y.S.2d 233, 235 (N.Y.Civ.Ct.1989). It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a debtor's estate. *Liona Corporation, Inc. v. PCH Associates, (In re PCH Associates),* 949 F.2d 585, 597 (2d Cir.1991) (citing *Sun Oil Co. v. CIR,* 562 F.2d 258, 263 (3d Cir.1977)), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978) (sale-leaseback was joint venture rather than nonresidential lease). *See also, Woodson,* 813 F.2d at 266 (participation agreement or loan); *In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir.1986) (lease or secured transaction); *In re Best Products Co., Inc.,* 157 B.R. 222 (Bankr. S.D.N.Y.1993) (purported lease with related corporation not a true lease but part and parcel of secured loan from third party); *In re Coronet Capital Co.,* 142 B.R. 78 (Bankr.S.D.N.Y.1992) (loan and not partic-

ipation agreement); *In re Cobham Enterprises, Inc.*, 62 B.R. 191 (Bankr.S.D.N.Y. 1986), *aff'd*, 72 B.R. 779 (S.D.N.Y.1987) (lease or security); *In re S.O.A.W. Enterprises, Inc.*, 32 B.R. 279, (Bankr.W.D.Tx. 1983) (participation agreement or loan).

Although the agreement itself is entitled "Construction Loan Participation Agreement," and § 3 states that "[t]he interest of [EAB] is that of an owner of a senior interest in the Loan and all security therefor, and [EAB] has not made a loan hereunder to [SMC]," these provisions conflict with the guts of the agreement, as discussed in detail below. Consequently I am not bound to the characterization set forth in the agreement. It is precisely this ambiguity in the agreement, which says that it is a rose but looks a lot like a chrysanthemum, that requires me to examine its economic substance to determine the true intent of the parties in entering into the transaction. *See, Cobham*, 62 B.R. at 191 (the phraseology of the documents should not be ignored, but the court should examine the economic substance of the transaction to determine whether it is in fact a true lease); *People v. Service Institute, Inc.*, 101 Misc.2d 549, 550, 421 N.Y.S.2d 325, 326 (Sup.Ct.Suff.Co., 1979) (mere fact that transaction may have been denominated a sale rather than a loan is not determinative).

**B. *Allocation of Risk and the Guarantee of Repayment***

In *Coronet Capital*, Judge Conrad found that a true participation agreement is one where money is advanced by a participant to a lead lender; a participant's right to repayment only arises when a lead lender is paid; only the lead lender can seek legal recourse against the borrower; and the document is evidence of the parties' true intentions. 142 B.R. at 82 (citing *In re Yale Express System, Inc.*, 245 F.Supp. 790 (S.D.N.Y.1965)). The 1987 Transaction appears to satisfy only the first of these four requirements.

In determining whether a transaction is a loan or a participation agreement, courts have generally viewed the risk allocation as the most significant factor, finding that agreements whereby the "participant" bears no risk of loss constitute debtor-creditor relationships in the form of loans rather than true participation agreements. *Woodson*, 813 F.2d at 271 (*citing* L. Cherkis, *Collier Real Estate Transactions & the Bankruptcy Code*, ¶ 4.05[3] at n. 44 (1984)) (referred to subsequently as *Collier Real Estate* ); G. Nelson, D. Whitman, *Real Estate Finance Law*, 418 (2d ed. 1985) *S.O.A.W.*, 32 B.R. at 279; *see, In re Lendvest Mortg., Inc.*, 119 B.R. 199 (9th Cir. BAP 1990); Drake & Weems, *Mortgage Loan Participations: The Trustee's Attack*, 52 Am.Bankr.L.J. 23, at 42–43 (1978). In a typical participation agreement, the lead lender makes no warranties or guarantees about the borrower's ability to repay the underlying loan. Thus, an indicium of a loan is the guarantee of repayment by the lead lender to a participant. *See, Coronet Capital*, 142 B.R. at 80 (citing Hutchins, *What exactly is a Loan Participation?*, 9 Rut.Cam.L.J. 447, 460 (1978)). *See also, Threedy*, 68 Or.L.Rev. 649; *Knight*, 3 Colum.Bus.L.Rev. 587.

For example, in *S.O.A.W.*, the debtor, a real estate developer, entered into a "Participation Agreement" with a bank which bought participations in "Agreements for Deeds". Under the terms of the asserted participation, the bank was entitled to receive 30% of the amount due from the vendees. However, until the bank received its 30%, it was entitled to take 100% of the payments made to the debtor. In addition, the debtor and its president guaranteed to the bank the return of both its investment and its interest. In light of this fact, the court found that the bank bore no risk of nonpayment, a position contrary to that of a "participant"—one who assumes the same risk as that of the person selling the participation or generating the loan. Hence, despite the label of "Participation Agreement" and despite language in the agreement to the effect that the bank was "participating" in certain "Agreements for Deeds", the court held that the arrangement constituted a loan. 32 B.R. at 282.

A similar analysis was made in *Woodson*, where the debtor was a mortgage broker who found potential borrowers and proposed loans. The initial financing for the loans was provided by Woodson Investors, Ltd. ("WIL"), a limited partnership in which the debtor was the sole general partner. The debtor maintained both "permanent" and "revolving" fund investors to "take out" WIL's interests in the loans. The arrangement provided for the permanent investors to receive a guaranteed interest rate on each investment and further guaranteed repayment regardless of whether borrowers made their monthly payments. An insurance policy from Fireman's Fund was purchased to insure the debtor's contractual obligations to its investors.

The debtor's bankruptcy trustee characterized the transactions between the debtor, WIL, and the permanent investors as loans made by the permanent investors to the debtor, while Fireman's Fund insisted that they represented the purchase of participation interests. Stating that this "is entirely different from participation transactions in which participants share in risk and must rely on the creditworthiness of the borrower and the collateral," the court agreed with the trustee that the transactions were loans. 813 F.2d at 271–72.

In the instant case, paragraphs 4, 5 and 6 of the 1987 Transaction reflect the existence of multiple guarantees to EAB (including from SMC's three principals) as well as a "with recourse" provision to SMC:

> WHEREAS, the limited partner of [YPH] has agreed to guarantee payment of the portion of the Loan purchased by [EAB] (the "Participant's Share"); and
> WHEREAS, shareholders of [SMC] have also agreed to guarantee repayment of the Participant's Share; and
> WHEREAS, [SMC] has agreed that the sale of Participant's Share shall be with recourse to [SMC];

What this all suggests is that SMC effectively was guaranteeing EAB repayment of the loan. EAB asserts that the recourse provision was nothing more than a credit enhancement. This argument is questionable. The "with recourse" provision placed responsibility for repayment of the loan on SMC. In effect, it could be said that EAB ran none of the risks that the underlying borrower would default because SMC was guaranteeing, along with its principals, the repayment of EAB's portion. The risk borne by EAB was that SMC would become insolvent. This is the risk which saddled all of SMC's creditors. Hence, EAB could be found to have been relying on the creditworthiness of SMC and could therefore be considered a creditor of SMC. *See, e.g., Woodson*, 813 F.2d at 271 (*citing Collier Real Estate*, ¶ 4.05[3] at n. 44 (1984)); *S.O.A.W.*, 32 B.R. 279. Risk of loss is one of the traditional hallmarks of ownership. Since by virtue of its recourse to SMC EAB ran no risk of loss on the underlying loan and only ran the risk that SMC was not creditworthy, there is a strong suggestion that EAB did not have an ownership interest in the underlying loan.

The agreement limited EAB's risk of loss beyond the provisions discussed above, for paragraph 5 states that EAB, upon default of YPH, is not required to contribute its proportionate share of the expenses and costs necessary to enforce any of the terms of the loan. The agreement also excused EAB from paying its *pro rata* share of taxes, maintenance costs or other expenses in relation to the sale of the property and enforcement of the underlying loan provisions.

Further, the agreement accorded EAB the right to receive payments prior to SMC. Specifically, § 3 of the 1987 Transaction provides, in pertinent part, that:

> All payments and recoveries received by sale of the Loan, payment, disposition or security, or otherwise by [SMC] shall be payable as follows:
> First: payment of interest due on [EAB's] Share;
> Second: payment of interest due on the interest retained by [SMC];
> Third: payment of the principal of [EAB's] Interest;
> Fourth: payment of the principal of [SMC's] retained interest;

Fifth: payment to [EAB] of the Additional Fee set forth in Section 9.

■■■■■ An indicator of a disguised loan is a provision for the participant to be guaranteed repayment of its principal and interest before the lead lender is to receive its portion. *See, Coronet Capital,* 142 B.R. at 81–82. Here, EAB was to receive its interest, but not its principal, prior to any payment to SMC; however, EAB was to be paid its principal before SMC was. EAB's argument runs that this distribution scheme differentiates this case from the result reached in *Coronet Capital.* This argument is not highly persuasive. The mere fact that SMC was to receive its interest payments before EAB was to receive payments on its principal does not make the 1987 Transaction into a participation agreement. To the contrary, the fact that EAB was in a preferential position to SMC is indicative of a loan.

■■■■ Under a typical participation agreement, the lead lender, though sometimes required to notify the participant of any default, maintains sole discretion over selection of the appropriate response. *See, In re Yale Express System, Inc.,* 245 F.Supp. 790, 792 (lead lender alone had the power to act in case of default by the underlying borrower). Although EAB urges that SMC was the only party that could take legal action against the borrower in the event of default, EAB actually maintained the right to determine the course of action to be taken. Paragraph 5 states that:

> [EAB] and [SMC] shall agree on a course of action, but in the event of any failure to agree upon any course of action ... [EAB] shall have the right to determine the course of action. Such decision ... shall be binding upon the parties hereto.

Thus, under the terms of the 1987 Transaction, EAB had the power to determine SMC's actions with respect to any default by the underlying borrower. Such relationship is contrary to a true participation agreement.

■■■ In a typical participation agreement, the participant pays the lead lender for administering the loan by a direct fee, an adjustment of the interest or both. *See, Threedy,* 68 Or.L.Rev. 649. Here, the roles were reversed. SMC was not to be paid a fee as the lead lender, but to pay a "participation fee" to EAB of $40,000 (¶ 8). The agreement also provided that EAB was to be paid an additional $210,000 in fees (¶ 9).

The provision for interest is yet another marker that this may have been a disguised loan rather than a participation. Pursuant to paragraph 10, SMC was required to pay EAB interest regardless of whether YPH, as mortgagor, paid its interest to SMC. Moreover, the amount of interest to be paid by SMC and YPH, respectively, was tied to the prime rates of different banks.

In sum, the economic substance of the 1987 transaction loudly hints that the parties intended to structure a lending relationship and not a participation.

### III.

#### A. *Commercial Reasonableness*

SMC contends that by virtue of its 100% interest in the YPH Notes, EAB's bid constituted an unreasonably small price for the Collateral and thus, the sale of the Collateral was not conducted in a commercially reasonable manner pursuant to New York law. Similarly, SMC argues that, as it received less than reasonably equivalent value, the sale ought be avoided pursuant to section 548 of the Bankruptcy Code.

The sale of collateral, upon default, is controlled by Article 9 of the New York Uniform Commercial Code (N.Y.U.C.C.) which invokes the commercial reasonableness standard. *In re Zsa Zsa Limited,* 352 F.Supp. 665, 669 (S.D.N.Y.1972), *aff'd,* 475 F.2d 1393 (2d Cir.1973). N.Y.U.C.C. § 9–504 provides in part:

> (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.
>
> (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts

... [E]very aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable ... [R]easonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor ... The secured party may buy at any public sale ...

N.Y.U.C.C. § 9–504 (McKinney's 1993).

 The term "commercially reasonable" is not specifically defined by the N.Y.U.C.C. and has been held to mean "that a qualifying disposition · must be made in the good faith attempt to dispose of the collateral to the parties' mutual best advantage." *Long Island Trust Co. v. Williams*, 133 Misc.2d 746, 507 N.Y.S.2d 993, 997 (N.Y.Civ.Ct.1986) (citing *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 368 N.Y.S.2d 268 (2d Dep't.1975)), *aff'd*, 142 Misc.2d 4, 539 N.Y.S.2d 612 (1988); *see also In re Monetary Group*, 95 B.R. 803, 811 (Bankr.M.D.Fl.1989). The New York Court of Appeals has implicitly validated two tests for determining whether a disposition of property was commercially reasonable under N.Y.U.C.C. § 9–504, one focusing on the procedures employed, and the other on maximizing resale price. *Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 51, 390 N.E.2d 766, 769 (1979). The procedural test examines the methods employed to dispose of the property. *Zsa Zsa Limited*, 352 F.Supp. at 670. If the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially reasonable standards, it should be shielded from the sanctions contained in Article 9. *Id.* at 671. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. N.Y.U.C.C. § 9–507(2). Further, the combination of a low price obtained for collateral and a lack of bidders is not necessarily the result of a commercially unreasonable sale, but can merely indicate a lack of demand for the collateral. *Sumner v. Extebank*, 88 A.D.2d 887, 452 N.Y.S.2d 873, 875 (1st Dep't.1982), *aff'd as modified*, 58 N.Y.2d 1087, 462 N.Y.S.2d 810, 449 N.E.2d 704 (1983).

 The *Bankers Trust* court, describing the second test, also known as the "proceeds" test, declared, "that optimizing resale price is the prime objective of the code's default mechanisms and that the other factors listed are merely designed to ensure that the highest price is achieved." 417 N.Y.S.2d at 51. The issue rests on the value of the collateral, since a "wide discrepancy" between the sale price and the value of the collateral signals a need for close scrutiny of commercial reasonableness. *Zsa Zsa Limited*, 352 F.Supp. at 671. "Under the proceeds test, a secured creditor's motion for summary judgment would fail if an issue of fact remained as to whether the optimum sale price had been obtained on a post-default disposition of collateral." *Federal Deposit Ins. Corp. v. Herald Square Fabrics Corp.*, 81 A.D.2d 168, 439 N.Y.S.2d 944, 954 (2d Dep't.1981). Where factual issues exist as to the commercial reasonableness of any aspect of the sale, as indeed they do here, summary judgment must be denied. *Kohler v. Ford Motor Credit Co.*, 93 A.D.2d 205, 462 N.Y.S.2d 297, 299 (3d Dep't.1983); *Herald Square Fabrics Corp.*, 81 A.D.2d at 168, 439 N.Y.S.2d at 954.

### B. *Reasonably Equivalent Value*

 A determination regarding whether a foreclosure sale was conducted in compliance with state law is also required under § 548(a)(2) of the Bankruptcy Code which provides that certain transfers may be avoided as fraudulent when, among other things, the debtor has received less than reasonably equivalent value. Courts disagree as to the proper standard to apply when determining if the debtor has received reasonably equivalent value. On one end of the spectrum is the standard employed in *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (5th Cir.1980) (a transfer for less than 70% of appraised fair

market value is not a transfer for reasonably equivalent value), while on the other end is *Madrid v. Lawyers Title Ins. Corp.*, (*In re Madrid*) 21 B.R. 424 (9th Cir. BAP 1982), *aff'd on other grounds*, 725 F.2d 1197 (9th Cir.1984), *cert. denied*, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984) (the price obtained at a non-collusive regularly conducted foreclosure sale irrefutably establishes reasonably equivalent value). The Supreme Court has recently taken *certiorari* on the issue whether a regularly conducted, non-collusive foreclosure sale is immune from attack as a fraudulent transfer. *In re BFP*, 974 F.2d 1144 (9th Cir. 1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2411, 124 L.Ed.2d 635 (1993).

The courts in this circuit have consistently rejected the rigid standards set forth in either *Durrett* or *Madrid*, preferring the more flexible case by case approach advocated in *Lindsay v. Beneficial Reinsurance Co.* (*In re Lindsay*), 98 B.R. 983 (Bankr.S.D.Cal.1989). *See Henry–Luqueer Properties, Inc. v. Mayo* (*In re Henry–Luqueer Properties, Inc.*), 145 B.R. 771, 774 (Bankr.E.D.N.Y.1992); *Brown v. Vanguard Holding Corp.* (*In re Brown*), 104 B.R. 609, 616 (Bankr.S.D.N.Y.1989), *app. den.* 119 B.R. 413 (S.D.N.Y.1990). The standard set forth in *Lindsay* is as follows:

First, the court should determine whether the foreclosure sale was properly conducted in accordance with state law and was non-collusive.

Second, the court should examine the totality of the circumstances surrounding the sale to determine whether commercially reasonable steps were taken to achieve the best price at the foreclosure. If the court is satisfied with the answer to the second inquiry, no further examination of the sale need be made.

98 B.R. at 991.

▬ Although the price paid at the foreclosure sale is not dispositive of the commercial reasonableness of the sale, in this case EAB's bid was based on EAB's erroneous interpretation of SMC's equitable interest in the YPH Notes. EAB argues that the $855,855 foreclosure price was reasonable based on what EAB calculated to be 75% of the debtor's 27.3% interest in the YPH Notes (predicated on a sale of $4 million to EAB of the $5.5 million face amount of the YPH Notes). However, the determination that the 1987 transaction was actually a loan rather than a participation agreement would mean that SMC retained a 100% equitable interest in the YPH Notes. Thus, under that scenario, even using the appraised value of the Collateral as proffered by EAB ($4.18 million), the price paid by EAB is less than 21% of what would be the value of SMC's interest in the loan.

▬ Not only is EAB's analysis of its rights challenged, but so too is the valuation of the Collateral which EAB employed. EAB's in-house appraisal, performed immediately prior to the foreclosure sale, estimates the value of the Yonkers property to be $4.18 million. SMC's appraisal, on the other hand, valued the property at $7 million as of January 31, 1990. Based on this independently performed appraisal, SMC estimated a property value of $7.5 million as of February 1, 1991.

EAB placed no value on the Wittek guarantee securing the YPH Notes when appraising the Collateral because, it claims, it had no basis by which to value that guarantee in light of SMC's failure to deliver any financial data concerning Wittek.

A determination regarding the commercial reasonableness of the foreclosure sale cannot be made until the values of the Yonkers property and the Wittek guarantee are determined. The condition (and therefore the actual fair market value) of the Collateral sold at the foreclosure sale is a question of fact for trial. *Kohler v. Ford Motor Credit Co.*, 93 A.D.2d 205, 462 N.Y.S.2d at 300.

## C. *Notice Under RPAPL § 231*

▬ SMC argues that I should look to RPAPL § 231 in determining the reasonableness of the foreclosure sale and the sufficiency of EAB's advance publication given the nature of the Collateral and the failure of N.Y.U.C.C. § 9–504 to define "commercially reasonable." SMC's argu-

ment is unsubstantiated by either statute or case law. RPAPL § 231 establishes reasonable procedures for notice by publication for foreclosure and judgment sales of real property. Here, the foreclosure sale of the Collateral is governed by N.Y.U.C.C. § 9–504 which deals with a secured party's right to dispose of collateral after default. That the Collateral, upon which EAB foreclosed, was itself secured by a mortgage on real property, to which the N.Y.U.C.C. does not apply, is of no moment for N.Y.U.C.C. § 9–102(3) provides that "[t]he application of [the U.C.C.] to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply." Accordingly, EAB was under no requirement to follow RPAPL § 231.

EAB advertised the May 14, 1991 foreclosure sale on April 26 through April 30 in three widely read local newspapers. Several parties responded to the advertisements and inquired about the Collateral, although none appeared at the sale. It appears that EAB's notice of the sale was sufficient for the purpose of § 9–504. *See, Leasing Service Corp. v. Carbonex, Inc.*, 512 F.Supp. 253, 256, 259 (S.D.N.Y.1981); *Credit Alliance Corp. v. David O. Crump Sand & Fill Co.*, 470 F.Supp. 489, 494–95 (S.D.N.Y. 1979) (advertisement was commercially reasonable where the notices appeared in three local newspapers on November 25–28 and the sale was held on November 30).[3]

### D. *Actual Intent*

SMC also claims that the sale should be avoided because it was made with the "intent to hinder, delay or defraud" creditors. 11 U.S.C. §§ 548(a)(1), 544(b) and N.Y. Debtor and Creditor Law ("DCL") § 276.

 DCL § 276 and § 548(a)(1) of the Bankruptcy Code are similar and provide that a conveyance made with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud present or future creditors, is fraudulent as to present and future creditors. *In re Chadborne Industries, Ltd.*, 71 B.R. 86 (Bankr.S.D.N.Y.1987). Actual intent is normally a question of fact which precludes summary judgment. *Trustees of Hamilton College v. Cunningham*, 70 A.D.2d 1048, 418 N.Y.S.2d 251, 254 (4th Dep't 1979). Moreover, where the transferee is in a position to dominate or control the debtor's disposition of his property, the transferee's intent to hinder, delay or defraud creditors may be imputed to the debtor to render the transfer fraudulent within section 548(a)(1) without respect to the actual purpose of the debtor transferor. 4 L. King, *Collier on Bankruptcy*, ¶ 548.02 at 548–35 (15th ed. 1993). Needless to say, EAB's intent is very much at issue. Finally, contrary to EAB's assertion, the statutes do not require that the elements of common law fraud be pled. SMC has sufficiently stated in its counterclaim a cause of action under § 548(a)(1) and DCL § 276. It is not clear whether EAB seeks summary judgment on this counterclaim, but if it does, plainly that relief is unwarranted.

### CONCLUSION

For the foregoing reasons, EAB's motion for summary judgment is denied in part, and granted in part. Factual issues regarding the value of the Collateral, EAB's representations and EAB's intent preclude the summary determination which EAB seeks regarding the validity of its foreclosure sale. Were it not for SMC's insistence that there are factual disputes concerning the participation agreement which preclude my granting summary judgment, I likely would have determined conclusively against EAB the participation versus loan issue. Whereas I am not clear what extrinsic evidence beyond that now in the record

---

**3.** In its reply brief, EAB argued that the debtor's conduct was unreasonable and therefore the debtor could not have detrimentally relied upon EAB's alleged misrepresentation such that the sale could be deemed commercially unreasonable. *See* EAB's Reply at 11. Whereas the debtor argues commercial unreasonableness, its papers and its answer do not allude to any estoppel theory. But even if the debtor were suggesting that EAB ought be estopped, factual disputes regarding what occurred would preclude a ruling at this time.

could be adduced, I will not reach out to decide the issue at this juncture.

Summary judgment is granted, however, dismissing SMC's claim that public notice of the foreclosure sale was inadequate.

SETTLE AN ORDER CONSISTENT WITH THIS DECISION. The parties are directed to call chambers to schedule a pretrial conference on the adversary proceeding.