FLETCHER, Circuit Judge:
 

 Appellant, trustee in bankruptcy, appeals from a summary judgment excluding assets from the bankrupt estate. We reverse and remand.
 

 FACTS
 

 In 1984, the debtor, Woodson Company (Woodson), a licensed mortgage broker, filed under chapter 11 of the Bankruptcy Code. At the time of bankruptcy Woodson had a loan portfolio worth $65 million composed of approximately 380 loans secured by deeds of trust to real estate; approximately 2,200 investors furnished the funds for the loans.
 

 Typically, Woodson located and evaluated proposed loans and potential borrowers. Woodson Investors, Ltd. (WIL), a California limited partnership of which Woodson was the sole general partner, provided the initial financing for approved loans. WIL was the payee of promissory notes executed by the borrowers and beneficiary of deeds of trust securing the notes.
 

 Woodson located “permanent fund” investors (permanent investors) or “revolving fund” investors (revolving investors) to “take out” the interests of the limited partnership in the loans.
 
 [1]
 
 WIL then assigned
 
 *268
 
 fractional interests in specific promissory notes and deeds of trust to the investors. The assignments were recorded in the county recorder’s office. Woodson kept possession of the promissory notes until paid or discharged by foreclosure. They were not endorsed by WIL to either Wood-son as attorney-in-fact for the investors, or to the investors.
 

 Woodson purchased an insurance policy from Fireman’s Fund whereby it insured Woodson’s contractual obligations to its investors. The agreement between the permanent investors and Woodson provided that the permanent investors receive a guaranteed rate of interest on each investment. The rate differed from agreement to agreement, the spread between that which the borrower paid Woodson and that which Woodson paid to the investor ranging between 1% and
 
 6%.
 
 Woodson guaranteed monthly payments to each investor regardless of whether borrowers made their monthly payments. Woodson also agreed to advance sums to cover senior encumbrances, taxes, insurance, and liens. In the event of default, Woodson negotiated with the delinquent borrower to work out the default. Woodson, however, did not consult the investors during this process nor obtain their approval of any new or modified terms. If a loan was foreclosed, the investors had an option either to receive payment in full (unpaid principal balance plus accrued interest) from Wood-son or to reimburse Woodson for the costs of foreclosure and to take title to the property at the time of sale. No investor ever exercised this latter option. Upon WIL’s acquisition of property through foreclosure, it immediately deeded the property to Woodson by grant deed in exchange for a promissory note in the full amount of the bid price at foreclosure.
 

 Woodson’s trustee in bankruptcy asserts that the loans are property of the bankrupt estate, and that he is entitled to hold all collections on the loans until the investors’ rights are determined in the bankruptcy proceedings. Fireman’s Fund and four plaintiffs brought suit and filed a motion for partial summary judgment seeking a declaratory judgment that the notes and deeds of trust are not property of the bankrupt estate but rather the property of the investors. Appellants, the trustee and creditors, responded with cross-motions for summary judgment. The bankruptcy court determined the interests of the permanent investors, reserving its ruling in respect to the revolving investors.
 
 [2]
 
 It held that the permanent investors’ claims were direct claims against the borrowers, not against the bankrupt estate and that the notes secured by the deeds of trust were owned by the investors, not the estate. The judgment required the trustee to pay all amounts received on the notes to those permanent investors whose notes and deeds of trust met the following requirements: (1) named WIL as payee and beneficiary; (2) were in Woodson’s possession; (3) were recorded (in the case of deeds of trust); and (4) were assigned from WIL by properly executed instruments. The district court affirmed the judgment of the bankruptcy court.
 

 1. Jurisdiction
 

 We must determine first whether we have jurisdiction to hear this appeal. 28 U.S.C. § 158(d) (Supp. Ill 1985) provides jurisdiction to our court for appeals from all final decisions, judgments, orders, and decrees entered by district courts in appeals to them from bankruptcy courts. The bankruptcy court held that the interests of the permanent investors were not part of the bankrupt estate and that the notes, deeds of trust and their proceeds should be delivered to Fireman’s Fund; it reserved judgment, however, on the nature of the interests of revolving investors. As
 
 *269
 
 the interests of the revolving investors and other issues remain to be decided, we must determine whether the decision of the lower court is final within the meaning of § 158(d).
 

 The Supreme Court has adopted a practical rather than a technical construction of the requirement of “finality”.
 
 Gillespie v. United States Steel Corp.,
 
 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964), (holding that the practical effects of marginally final orders must be taken into account in determining appealability). That a pragmatic approach to finality is necessary in bankruptcy proceedings was recognized by this court in
 
 In re Mason,
 
 709 F.2d 1313, 1318 (9th Cir.1983) where we found jurisdiction to hear the appeal of a denial of a motion to vacate an order for relief. In finding that such an order was final for purposes of appeal in bankruptcy cases, this court stated, “one thing seems clear: certain proceedings in a bankruptcy case are so distinct and conclusive either to the rights of individual parties or the ultimate outcome of the case that final decisions as to them should be appealable as of right.”
 
 Id.
 
 at 1317. This court focused on similar concerns in
 
 In re Exennium, Inc.,
 
 715 F.2d 1401, 1403 (9th Cir.1983). The bankruptcy court had determined that the sale of leases from the debtor to a third party was void because the third party was the debtor’s former attorney. Although this holding did not settle finally the dispute between the trustee and the lessor, this court heard the appeal because it was “fundamental to the further outcome of this case” and “[u]ntil settled this issue will cast its shadow over further administration of the estate”.
 
 See also In re Saco Local Development Corp.,
 
 711 F.2d 441 (1st Cir.1983) (an order establishing the fact of priority but not the amount is a final order for purposes of appeal).
 

 As the partial summary judgment in this case does not determine the interests of the revolving investors,
 
 [3]
 
 we must decide whether the interests of the two types of investors are intertwined in such a way that resolution of the rights of the permanent investors affects or is affected by resolution of the claims of the revolving investors. On some loans, the funds of the revolving investors were used to supplement the permanent investors’ funds. For example, if Woodson could fund only 90% of a particular loan with funds from permanent investors, the other 10% would be funded by the revolving investors. Thus the revolving investors claim a partial interest in some of the same notes and deeds of trust in which permanent investors claim a partial interest. If the revolving investors ultimately are held to be general creditors, to the extent assets are removed from the estate, they may suffer. Rather than looking to the financial consequences that the decision may have on the revolving investors, however, we must determine whether the discrete legal issue of whether the permanent investors loaned money against the security of the deeds of trust or purchased participations in the loans can be decided separately from the determination of the nature of the interests of the revolving investors.
 

 The transactions between the revolving investors and Woodson and the permanent investors and Woodson were very different in character. Whereas each permanent investor selected the specific loan or loans in which to invest and furnished funds for a specific percentage participation in a specific loan, the revolving investors each deposited $100,000 into a passbook savings account over which Woodson had a power of attorney and from which it could withdraw funds at its discretion. Permanent investors had to wait until the loan matured before repayment to them; revolving investors, on the other hand, could withdraw their funds upon giving Woodson 30 days notice. The same rate of interest was paid to all revolving investors and was tied to the Bank of America’s rate for certificates of deposit or Woodson’s lending rate, whichever was greater, while the rate of
 
 *270
 
 interest paid permanent investors was tied to the specific loans in which they invested.
 

 These differences suggest that the issue of whether the permanent investors purchased participation interests or made loans to Woodson is discrete and unrelated to the determination of the nature of the revolving investors’ interests. The transactions of each group of investors are sufficiently distinct that deciding whether permanent investors purchased participation interests or lent Woodson money does not determine the characterization of the transaction between Woodson and the revolving investors or the nature of the interest which the revolving investors may have in the notes and deeds of trust. Determination of whether the permanent investors own the notes and mortgages or whether they are part of the bankrupt estate is obviously exceedingly important to the course of the future administration of the estate and the rights of general creditors. We conclude that this issue meets the
 
 Mason-Exennium
 
 test: it is distinct and conclusive in respect to individual parties (the permanent investors) and casts a shadow over further administration of the estate until it is settled. We conclude the order is “final” and subject to review by this court.
 
 See In re White,
 
 727 F.2d 884, 886 (9th Cir.1984) (determination that asset is property of estate or exempt is final and appeal-able).
 

 II. Standard of Review
 

 Because we are in as favorable a position as the district court to review the findings of the bankruptcy court, we review the district court’s decision de novo.
 
 In re Herbert,
 
 806 F.2d 889, 891 (9th Cir.1986);
 
 In re Jee,
 
 799 F.2d 532, 534 (9th Cir.1986). Accordingly, we review the bankruptcy court’s findings of fact for clear error; we review its conclusions of law de novo.
 
 Id.
 

 III. Nature of the Transactions
 

 Appellee Fireman’s Fund characterizes the transactions between Woodson, WIL and the permanent investors as the purchase of participation interests, while the trustee insists the permanent investors simply made loans to Woodson. Whether the notes and deeds of trust are assets of the estate turns at least in part on the proper characterization of the transactions.
 
 [4]
 

 Appellees suggest that section 541(d) of the Bankruptcy Code, 11 U.S.C. § 541(d), (Supp. Ill 1985)
 
 [5]
 
 dictates the outcome of this case, arguing that Woodson, at most, holds legal title, and accordingly, that the equitable title of the permanent investors is excluded from the bankrupt’s estate by the terms of § 541(d). Appellees assume too much. Whether the permanent investors have equitable title turns on whether they are owners of participation interests. If they have no ownership interests but rather are lenders only, § 541(d) does not apply-
 

 A typical participation transaction involves a lead lender who retains some interest in the transaction, retains possession of the note, and retains the power to enforce against the mortgagor. Battles rage over whether such arrangements are best characterized as establishing creditor-debtor relationships between the participants and the lead lender, or whether they involve trust relationships or are present assignments coupled with an agency permitting the lead lender to collect.
 
 See
 
 L. Cherkis,
 
 Collier Real Estate Transactions
 
 
 *271
 

 and the Bankruptcy Code
 
 ¶ 4.05 (1984); Drake & Weems,
 
 Mortgage Loan Partic-ipations: The Trustee’s Attack
 
 52 Amer. Bankr.LJ. 23 (1978); MacDonald,
 
 Loan Participations as Enforceable Property Rights in Bankruptcy
 
 — A
 
 Reply to the Trustee’s Attack
 
 53 Am.Bankr.L.J. 35 (1979). The significance of the trust or ownership characterization is that it effectively removes the
 
 res
 
 from the bankrupt estate. “The arguments for the beneficiary-trustee characterization of the ... relationship appear stronger than the arguments favoring the creditor-debtor relationship. A participant’s decision to invest in a given loan transaction will ordinarily be based upon its determination of (a) the creditworthiness of the underlying borrower, (b) the quality of the collateral, (c) the terms of the underlying loan, (d) the financial terms of the proposed participation arrangement, (e) the recommendation of the transaction by the lead lender and (f) the experience and reputation of the lead lender.” L. Cherkis,
 
 supra
 
 4.05[3].
 

 The transaction in this case is different from the typical participation transaction in two aspects. First, Woodson did not retain a percentage participation as lead lender in any of the loans. Second and most significantly, Woodson relieved the permanent investors of all risk of loss. This latter feature seems to result in a finding of a debtor-creditor relationship in most cases.
 
 See
 
 L. Cherkis,
 
 supra,
 
 114.05[3] at n. 44; G. Nelson, D. Whitman,
 
 Real Estate Finance Law
 
 418 (2d ed. 1985); Drake & Weems,
 
 supra
 
 at 42-43.
 
 See also In re S.O.A.W. Enterprises, Inc.,
 
 32 B.R. 279 (Bankr.W.D.Tex.1983). At issue in
 
 S. O.A. W.
 
 was the nature of transactions in which the debtor corporation, S.O. A.W., a real estate developer, entered into financing arrangements with a bank whereby the bank “purchased” participations in “Agreements for Deeds.” The bank was entitled to receive 30% of the amount due from the buyers. However, until the bank received its 30%, it was entitled to receive 100% of all payments made by the buyers to the debtor. The debtor and its president guaranteed to the bank both the return of its investment and interest.
 

 Upon the bankruptcy of S.O.A.W., the court found that the bank did not have a right to the continued receipt of funds because the transactions at issue were disguised loans rather than sales of participation interests. The court focused on the fact that the bank had no risk of loss. A “participant” normally assumes the same risks as the person selling the participation.
 
 Id.
 
 at 282.
 
 See also In re Executive Growth Investments, Inc.,
 
 40 B.R. 417 (Bankr.C.D.Cal.1984) (finding that whether the buyer bore the risk of loss in the event of nonpayment was the dispositive issue in determining whether a transaction transferred ownership of a fractional interest in a promissory note);
 
 In re Columbia Pacific Mortgage, Inc.,
 
 20 B.R. 259 (Bankr.W.D.Wash.1981) (finding that there was a valid sale of a participation interest in a transaction where the seller and purchaser shared ratably in the expense and income of disposing of property upon default);
 
 In re Alda Commercial Corp.,
 
 327 F.Supp. 1315 (S.D.N.Y.1971) (finding that arrangement whereby “joint venturers” provided funds to debtor was a loan rather than a joint venture because there was no sharing in the profits of the debtor nor did the petitioner play any part in the management of accounts).
 

 • In the case before us, permanent investors were not subject to any risk when they transferred funds to Woodson. They were paid interest monthly regardless of whether the original borrower paid Woodson. In the event of default, Woodson paid the investor the interest and the balance principal owed on the investor’s “participation.” The insurance contract with Fireman’s Fund made lending money to (or investing money with) Woodson a risk-free investment. We can conceptualize the transaction as one in which Fireman’s Fund served the function of an FDIC and Woodson the function of a borrowing bank. Woodson did not merely guarantee a certain return, but effectively guaranteed against all risk of loss. This is entirely different from
 
 *272
 
 participation transactions in which participants share in risk and must rely on the creditworthiness of the borrower and the collateral.
 

 The rate of interest which Woodson paid the permanent investors also suggests that the relationship was that of debtor-creditor. If the investors had purchased participation interests, the rate of interest which they received from Woodson normally would be based on a spread reflecting a reasonable and usual charge for servicing the loans for the investor-owners. Here, there was wide variation in the spread from transaction to transaction. On some notes, there was as much as a 6% spread between the interest rate paid by borrowers and that paid to investors, on others as little as 1%. This suggests that the rates were tied to prevailing borrowing rates at the time the permanent investors made funds available, rather than representing a servicing fee, an indication of lending, not purchase.
 

 We conclude that the transactions with permanent investors were loans. The permanent investors possessed none of the usual indicia of ownership. By contrast, Woodson retained all of the obligations of an owner and conducted itself throughout as owner. Simply calling transactions “sales” does not make them so. Labels cannot change the true nature of the underlying transactions.
 
 [6]
 

 See Helvering v. Lazarus & Co.,
 
 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939);
 
 In re Berez,
 
 646 F.2d 420, 421 (9th Cir.1981). From the facts surrounding these transactions we conclude the bankruptcy court was clearly erroneous in finding them purchases and sales.
 

 We reverse and remand to the bankruptcy court to make such other determinations as may be required in light of our holding.
 
 [7]
 

 [1]
 

 . Although both the revolving and the permanent investors transferred funds to Woodson, the means by which they did so differed greatly. For the revolving investors, Woodson opened passbook savings accounts in each revolving fund investor’s name on which The Woodson Company was named as trustee and from which Woodson, under a limited power of attorney, could withdraw funds. Each investor deposited $100,000 to his account. The permanent investors, on the other hand, made checks payable to Woodson that were deposited in Woodson's own account. Investors received in return various guarantees from Woodson and at some later time were assigned notes and deeds of trust by WIL. Permanent investors personally selected the loans in which they participated whereas Woodson determined how to use the revolving investors' funds. Both permanent and revolving investors executed powers of attorney to Woodson to act for and on their behalves in collecting loans and dealing with defaults. Woodson would use revolving funds both to fund entire loans and to "fill out" loans which had been principally assigned to permanent investors. The assignments of deeds of trust and underlying notes were not recorded for revolving fund investments. The guaranteed rate of interest for revolving fund investments was a
 
 *268
 
 floating rate based on the greater of Bank of America’s certificate of deposit rate or Wood-son’s lending rate. Revolving investors, unlike the permanent investors, did not have to wait until the loans matured but could withdraw their funds on 30 days notice.
 

 [2]
 

 . Pursuant to a settlement, Fireman’s Fund succeeded to the interests of approximately 1900 permanent and revolving investors. Not all investors, however, were covered by the settlement.
 

 [3]
 

 . Although Fireman’s Fund’s complaint prayed for relief for both revolving and permanent investors, at oral argument in bankruptcy court Fireman’s Fund limited the relief sought to the permanent investors.
 

 [4]
 

 . The ambiguity of the relationship of WIL and Woodson and the fact that WIL has legal title to the notes and deeds of trust may raise unresolved issues as to WIL’s interest that are not before us.
 

 [5]
 

 . Section 541(d) of the Bankruptcy Code provides that:
 

 Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor’s legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
 

 [6]
 

 . Our court recently decided
 
 In re Golden Plan of California,
 
 812 F.2d 1088 (9th Cir.1987) (second amended opinion). The court held that the transactions were purchases and sales of notes and deeds of trust. In contrast to our case, payments were not guaranteed (notes were assigned without recourse) and upon foreclosure the purchasers were left to their own remedies against borrowers. In other words, they bore the ordinary risks of ownership.
 

 [7]
 

 . The interest of WIL, if any, and the question of whether the loans are secured or unsecured are not before this court in this appeal.