633 So.2d 177 (1993)
Sherman BERNARD, Commissioner of Insurance for the State of Louisiana
v.
FIRESIDE COMMERCIAL LIFE INSURANCE COMPANY.
No. 92 CA 0237.
Court of Appeal of Louisiana, First Circuit.
November 24, 1993.
Writ Denied March 11, 1994.
*178 Carey R. Holliday, Baton Rouge, for plaintiff-appellant Second Com'r of Ins., State of LA.
Philip K. Jones, Jr., New Orleans, for defendant-appellee F.D.I.C. as Receiver for Key Sav. and Loan Ass'n.
Bert K. Robinson, Baton Rouge, for defendant in rule-appellant First Magnolia Life Ins. Co.
Before CARTER, LeBLANC and PITCHER, JJ.
LeBLANC, Judge.
This matter arises from two claims asserted by the Federal Deposit Insurance Corporation (FDIC) in an intervention filed in the rehabilitation proceedings of Fireside Commercial Life Insurance Company (Fireside), a domestic life insurance company. First, FDIC claimed ownership of certain funds Fireside transferred to Magnolia Life Insurance Company (Magnolia) prior to the initiation of rehabilitation proceedings by the Louisiana Commissioner of Insurance (Commissioner). The trial court rejected this contention.
FDIC's second claim involved a certain transaction involving the transfer of $1,141,300.00 in assets from Fireside to Magnolia. FDIC argued this transfer was invalid and, therefore, the assets should be returned by Magnolia to Fireside's estate for the benefit of its creditors, including FDIC. The trial court ultimately rendered judgment on this claim ordering Magnolia to pay FDIC $268,803.35, the amount Fireside was indebted to FDIC.
Magnolia and the Commissioner have appealed this judgment, and FDIC answered the appeals. For the reasons below, we reverse the portion of the trial court judgment ordering Magnolia to pay FDIC $268,803.35.

FACTUAL BACKGROUND
1. On December 31, 1985, Magnolia loaned $1,010,000.00 to Fireside Holding Company. There was trial testimony that John Bennet Waters, CEO of both Fireside and Fireside Holding Company, represented that the purpose of the loan was to infuse money into Fireside to prevent it from being listed as impaired by the Commissioner.
2. Fireside and Magnolia subsequently entered into negotiations concerning an agreement whereby Magnolia would reinsure all of Fireside policies.
3. On August 29, 1986, Magnolia and Fireside Life entered into a reinsurance agreement pursuant to which Magnolia was to pay $11,000,000.00 to Fireside in exchange for the conveyance of all of Fireside's inforce *179 policies to Magnolia[1], which was to assume all liability on these policies. Fireside also agreed to convey to Magnolia assets, acceptable to Magnolia, equal to the amount of policy reserves required by the Commissioner, to the extent that the required reserves exceeded the purchase price of the policies. The agreement, which was scheduled to close on January 2, 1987, was contingent upon the approval of the Commissioner.
4. According to the agreement, in the interim before the scheduled closing, Fireside was to cease writing new policies and Magnolia was to collect the premiums due on Fireside's existing policies, in exchange for a service fee consisting of a certain percentage of the premiums collected. In the event that the reinsurance agreement did not close as contemplated, this fee was to equal twenty percent of the premiums collected.
5. When it subsequently appeared that Fireside Life was unable to transfer sufficient assets to Magnolia to fulfill the original agreement, the parties entered into an amended agreement which was signed on January 2, 1987. This agreement decreased the purchase price for Fireside's policies to $10,650,000.00, while retaining the requirement that Fireside convey assets to Magnolia in an amount equal to the policy reserves required by the Commissioner, to the extent that these reserves exceeded the purchase price.
6. The amended agreement additionally required Fireside to transfer assets to Magnolia in the amount of $1,141,300.00 as payment of the December 31, 1985 loan from Magnolia to Fireside Holding Company. The agreement stated that this transfer (sometimes referred to hereafter as the Fireside Holding transaction) was also in satisfaction of the twenty percent service fee Fireside owed to Magnolia for the collection of the premiums due on Fireside's policies from September through December of 1986.
7. The Commissioner approved the amended reinsurance plan on January 6, 1987.
8. On January 30, 1987, an "Interim Acknowledgement" was executed transferring a block of policies, along with assets sufficient to cover the reserve liability on those policies, from Fireside to Magnolia, pursuant to the amended agreement signed on January 2, 1987. The interim acknowledgement was approved by the Commissioner on April 2, 1987.
9. Fireside and Magnolia continued attempts to locate further acceptable assets so that additional Fireside policies could be transferred to Magnolia, with the said assets covering the reserve liability applicable to those policies.
10. In late May or early June of 1987, Magnolia informed the Commissioner it believed Fireside would be unable to transfer sufficient assets to cover the required policy reserves on the remaining policies as required by the January 2, 1987 agreement.
11. An agreement was thereafter reached pursuant to which Magnolia agreed to reinsure all of Fireside's remaining known policies in exchange for Fireside assigning all of its remaining assets to Magnolia. Although the record does not clearly establish the date this agreement was reached, it was formally approved by the Commissioner by order issued on June 26, 1987.
12. On June 24, 1987, Magnolia officials visited Fireside's office in Shreveport in order to acquire possession of Fireside's remaining assets. At that time, a $470,000.00 check drawn on Fireside's operating account was given to Magnolia; the check was deposited into Magnolia's bank account on June 26, 1987.
13. On July 9, 1987, the Commissioner filed a petition for rehabilitation in district court, asserting Fireside had obligations and claims exceeding its assets and could not pay its contracts in full as they matured. The Commissioner prayed for an order placing Fireside in rehabilitation and approving the reinsurance agreement entered into by Fireside and Magnolia on August 29, 1986, as amended on January 2, 1987, as well as the interim acknowledgement of January 30, *180 1987, as part of the Commissioner's plan for rehabilitation of Fireside.
14. Attached to the Commissioner's petition was a copy of a resolution of Fireside's board of directors stating that, whereas it had complied with only a portion of its obligations under its agreement with Magnolia and was unable to comply with the remainder thereof, it consented to being placed in rehabilitation and waived notice and appearance at any hearing held on the plan submitted by the Commissioner.
15. On July 9, 1987, the district court signed an order placing Fireside in rehabilitation and ordering that the reinsurance agreement between Fireside and Magnolia be made a part of the rehabilitation order.

PROCEDURAL BACKGROUND
A petition for intervention was filed in these rehabilitation proceedings on July 28, 1989, by the Federal Savings and Loan Insurance Corporation (FSLIC), as receiver for Key Savings and Loan Association (Key). The petition alleged that on November 3, 1983, Fireside sold Key a 68.14 percent "participation" interest in an existing loan from Fireside to Calkey, Inc.; that Calkey paid the balance due on this loan to Fireside in June, 1987; and, Fireside failed to pay Key its proportionate interest in the loan payoff funds. FSLIC requested that Fireside, the Commissioner, or any other party having possession of Key's funds, in the amount of $270,000.00, be ordered to transmit the funds to FSLIC. Service was requested only on the Commissioner.
As statutory successor to FSLIC, FDIC filed a rule to show cause against Magnolia on January 2, 1990, claiming Magnolia was in possession of the Calkey loan proceeds as a result of the $470,000.00 check it received from Fireside on June 24, 1987, and praying that Magnolia deposit these funds into the court registry and pay FDIC its proportionate interest thereof. At that time, Magnolia was not a named defendant in FDIC's intervention.
After a hearing on February 16, 1990, the court denied FDIC's request that Magnolia be required to deposit funds into the court registry. However, in the interest of moving the proceedings forward, the court ordered FDIC to file a petition naming Magnolia as a defendant within fifteen days "asserting its claim of ownership of a participation interest in the loan by Fireside to Calkey, Inc. and the funds relating thereto...."
Thereafter, FDIC filed its first amending petition naming the Commissioner and Magnolia as defendants, alleging the $470,000.00 check received by Magnolia from Fireside on June 24, 1987, included therein Key's share of the Calkey loan proceeds. The $470,000.00 check was drawn on Fireside's operating account, the same account into which Fireside had deposited the Calkey loan payoff. FDIC prayed that Magnolia be ordered to return these funds to the Commissioner, who was to return them to FDIC.
In response, Magnolia filed an answer and reconventional demand in which it denied FDIC's claims and requested, in the alternative, that if FDIC prevailed there be a return by the parties to the previous status quo ante.
In September, 1990, FDIC requested leave to file a second amending petition of intervention which set forth the additional claim that the Commissioner, as Fireside's rehabilitator, was obligated to seek recovery of the assets transferred from Fireside to Magnolia pursuant to the Fireside Holding transaction. This assertion was based on the allegation that Fireside was not liable to Magnolia for the loan made to Fireside Holding Company and, furthermore, that the transfer of assets occurred at a time when Fireside was insolvent. The petition additionally contended that, in the absence of action by the Commissioner, FDIC was legally entitled to seek recovery of these funds. The trial court refused to allow the amending petition to be filed at that time.
FDIC next filed a rule against the Commissioner to show cause why he should not be compelled to seek recovery from Magnolia of the assets it acquired as a result of the Fireside Holding transaction or why FDIC should not be appointed to seek recovery of these assets. After a hearing, the trial court denied FDIC's rule.
*181 Trial of this matter was held on January 2, January 3, January 11, January 18 and February 22, 1991. Neither the Commissioner nor his counsel participated in the trial.[2]
During trial on January 3, 1991, the trial court reversed its prior ruling and allowed FDIC to file the second amending petition described above, seeking recovery of the assets transferred to Magnolia pursuant to the Fireside Holding transaction.

ACTION OF THE TRIAL COURT
Following trial, the court rendered judgment on April 23, 1991, in favor of Magnolia and the Commissioner dismissing FDIC's intervention. In its written reasons for judgment, the court rejected FDIC's claim to an ownership interest in the proceeds of the Calkey loan payoff, finding that the November 3, 1983 transaction between Key and Fireside was a loan to Fireside from Key, rather than a true participation. The court found that FDIC was merely an unsecured creditor of Fireside in the amount of $253,798.92.
Regarding FDIC's attack upon the Fireside Holding transaction, the court concluded that this transfer of assets to Magnolia constituted a voidable preference under La.R.S. 22:745 B.[3] Further, the court found that Fireside's agreement to pay the Fireside Holding loan was absolutely void because the loan was contra bonos mores, since its obvious purpose was to avoid insurance regulations by infusing money into Fireside without the loan being listed as a liability of Fireside. The court nevertheless found that any attack upon this preferential transfer was preempted because it was not timely filed under La.R.S. 22:745B.[4]
Thereafter, a motion for new trial was filed by FDIC. At the hearing on this motion, the trial court indicated that it had altered its position and was now convinced that there was insufficient evidence in the record to sustain its conclusion that the Fireside Holding Company loan was contra bonos mores. The court explained that some of the testimony it relied upon in reaching its original conclusion was proffered rather than admitted testimony, and some of it was merely speculation. Additionally, the court stated that it had also erred in its original conclusion that FDIC was preempted from asserting a claim attacking the Fireside Holding transaction, due to the court's incorrect reading of La.R.S. 22:745 B.
Accordingly, the court granted a new trial and rendered an "Amended Final Judgment" on July 22, 1991, in favor of FDIC, holding that Magnolia should return to Fireside's estate the $1,143,000.00 it received as a result of the Fireside Holding transaction. The judgment also ordered the Commissioner to administer these funds in accordance with La.R.S. 22:731 et seq. and recognized FDIC as an unsecured creditor of Fireside in the *182 amount of $268,803.35. The court denied Magnolia's reconventional demand.
Following rendition of the amended judgment, Magnolia filed a motion for new trial. In granting this motion, the trial court noted that, although it had not changed its conclusion that the Fireside Holding transaction should never have occurred, the evidence at trial revealed that the value of many of the assets transferred from Fireside to Magnolia pursuant to the reinsurance agreement were not as alleged, some of them being "completely worthless". After further noting that FDIC was the only creditor complaining about the Fireside Holding transaction and that the claims of any other creditors had prescribed, the court held that "the equitable thing to do would be to recognize FDIC's claim for two hundred and sixty-eight thousand eight hundred and three dollars and thirty-five cents [$268,803.35], not based on [FDIC] owning a percentage of the participation agreement, but based on being a creditor and based on the fact that I think that the one million should not have been transferred to Magnolia." On September 30, 1991, the court rendered a "Second Final Amended Judgment". This judgment modified the judgment of July 22, 1991, by providing that Magnolia was to pay $268,803.35 directly to FDIC; all other claims against Magnolia were dismissed. In contrast to the July 22, 1991 judgment, this judgment set aside the Fireside Holding transaction only to the extent of Fireside's indebtedness to FDIC ($268,803.35).
Separate appeals were taken from this judgment by Magnolia and the Commissioner. FDIC answered these appeals.
The primary issues raised on appeal by Magnolia and the Commissioner are whether FDIC had a right and/or a cause of action to assert its claims against Magnolia, and whether the trial court erred in partially setting aside the Fireside Holding transaction and ordering Magnolia to return funds to FDIC. FDIC's primary complaints are that the trial court should have set aside the entire Fireside Holding transaction, rather than merely a portion thereof, and that the trial court should have recognized FDIC as the owner of a participation interest in the Calkey loan.[5]
In addressing these issues, we will examine the Fireside Holding transaction and FDIC's claim to ownership of a participation interest in the Calkey loan separately.

FIRESIDE HOLDING TRANSACTION
On appeal Magnolia and the Commissioner contend the trial court erred in allowing FDIC to attack the Fireside Holding transaction whereby Fireside transferred assets totalling $1,141,300.00 to Magnolia in payment of the Fireside Holding Company loan of December 31, 1985.[6] FDIC contends this transaction was invalid as the payment of a thing not due, since the loan was made by Fireside Holding Company rather than Fireside. Thus, FDIC argues Magnolia should return these assets to Fireside's estate, where they would be available for payment to Fireside's creditors, including FDIC.
Before trial, Magnolia had filed exceptions of no cause and no right of action in response to FDIC's amended petition setting forth this claim, which were overruled by the trial court. In allowing FDIC to maintain this claim, the trial court accepted FDIC's argument that the July 9, 1987 rehabilitation order approving the Commissioner's rehabilitation plan, including the Fireside Holding transaction, was invalid because it was approved without notice to Fireside's creditors. We believe the trial court erred in disregarding the rehabilitation order and in overruling Magnolia's exceptions because: (1) the finality of the rehabilitation order, which included approval of the Fireside Holding transaction within its scope, precluded FDIC's attack on the transaction; and, (2) FDIC did not have a cause of action nor a right of action against *183 Magnolia to set aside this transaction. We will consider the effect of the rehabilitation order first, because we believe the finality of this order precluded FDIC's attack on the Fireside Holding transaction, even assuming arguendo that FDIC did have a right and a cause of action against Magnolia.

1. Finality of Rehabilitation Order

The rehabilitation order signed by the trial court on July 9, 1987, approved the reinsurance agreement reached between Fireside and Magnolia, including the Fireside Holding transaction, as part of the Commissioner's rehabilitation plan. However, FDIC contends that this order should be disregarded since FDIC's predecessor, Key (a Fireside creditor), received no notice of a hearing on the reinsurance plan.[7] On appeal FDIC argues that:
There is no evidence in the record that notice of a hearing was given to Key [FDIC's predecessor in interest] or any other creditors in connection with the District Court's Order. The approval of the Reinsurance Plan as contained in the July 9, 1987 Order did not comport with the statutory notice obligations of the Commissioner nor the minimum notice requirements of the Fourteenth Amendment of the United States Constitution and article 1, section 2 of the Louisiana Constitution. Thus, the District Court was obligated to review and reconsider its Order pursuant to FDIC's intervention....
The trial court accepted FDIC's position that the rehabilitation order was invalid, at least in part, because it was approved without notice to Fireside's creditors. The trial court erred in doing so. The rehabilitation order was a final judgment remaining in full force and effect at the time of FDIC's intervention. Therefore, FDIC could not properly challenge any aspect of the reinsurance agreement approved by the rehabilitation order, including the Fireside Holding transaction, as long as this judgment remained viable.
Only three avenues are available to alter the substance of a final judgment: 1) timely application for new trial; (2) timely appeal; and, (3) nullity of the judgment. See, Webster v. Boh Bros. Const. Co., Inc., 603 So.2d 761, 763 (La.App. 4th Cir.1992). In the present case, no application for new trial was filed, nor was an appeal taken from the rehabilitation order. Accordingly, this judgment was final and definitive at the time FDIC filed its intervention.
The only option remaining to FDIC to avoid the effect of this order was to have it annulled. However, FDIC filed no formal pleadings to annul or set aside the order. In fact, FDIC indicated at trial that it was not seeking to set aside the entire order, but felt it was entitled to disregard that portion of the order approving the Fireside Holding transaction because it received no notice of the Commissioner's rehabilitation plan, stating:
[FDIC counsel]: Your honor, I just should note for the record that FDIC has not asked that the [July 9, 1987] order be set aside. It is just that we have alleged when they [Magnolia] rely upon this order as a blessing of the transaction with regard to the transfer of the monies in the Calkey loan ... FDIC has not asked that the order be set aside. It is just that that order may not protect the transfer of monies that the FDIC alleges belong to them and that they [Magnolia] knew or should have known belonged to them [FDIC]
The Court: You've alternatively requested that the order be set aside to the extent that
[FDIC counsel]: The million one coming fromYes, sir. To that extent and that extent alone. We are not attacking the rest of it [July 9, 1987 order]. We don't believe it's necessary.... But at least to the extent that we are a creditor, the transfer of the million one [Fireside Holding transaction] should be set aside and enough should be retransferred
In any event, a final judgment may be annulled only for certain vices of form and substance set forth in La.C.C.P. arts. 2002 and 2004, respectively. La.C.C.P. art. 2002 *184 provides that a judgment should be annulled for the following vices of form:
(1) if rendered against an incompetent person not represented as required by law;
(2) if rendered against a defendant who was not served with process as required by law and who did not enter a general appearance, or against whom a valid judgment by default has not been taken; or
(3) if the rendering court did not have subject matter jurisdiction over the suit.
A judgment is an absolute nullity if any of these vices of form exists, and may be attacked collaterally at any time. Moody v. Dupont Mfrs., 535 So.2d 384, 386 (La.App. 3rd Cir.1988); LeGlue Buick, Inc. v. Smith, 390 So.2d 262, 264 (La.App. 3rd Cir.1980). The grounds for absolute nullity enumerated in article 2002 are exclusive. Sweeney, Inc. v. Olivier, 589 So.2d 61, 62 (La.App. 1st Cir.1991).
La.C.C.P. art. 2004 provides that a vice of substance exists, and a judgment may be annulled, when the judgment is obtained by fraud or ill practices. In contrast to the vices of form enumerated in La.C.C.P. art. 2002, vices of substance give rise only to relative nullity. The jurisprudence clearly distinguishes between the procedural requirements for seeking annulment of an absolute nullity, as opposed to the requirements for seeking annulment of a relative nullity. When the judgment complained of is a relative nullity because of fraud or ill practices, a separate, direct action for nullity must be filed. Moody, 535 So.2d at 386; LeGlue, 390 So.2d at 264.
In the present case, it is obvious that the deficiency of which FDIC complains, failure of a creditor to receive notice of a hearing on the Commissioner's rehabilitation plan, does not come within the scope of any of the exclusive grounds for absolute nullity provided by La.C.C.P. art. 2002. This Court reached the same conclusion with respect to a similar complaint in Sweeney, Inc. v. Olivier, 589 So.2d 61 (La.App. 1st Cir.1991), where the defendant complained that he did not receive notice of trial. After discussing the paramount importance of notice, the Sweeney court held that lack of notice of trial is not an absolute nullity under article 2002, but constitutes an "ill practice" within the purview of article 2004, which must be brought in a direct action within one year of the discovery thereof. Sweeney, 589 So.2d at 62-63.
As noted, FDIC did not file any formal pleadings to set aside the rehabilitation order of July 9, 1987, much less a direct action to annul this judgment. Therefore, the trial court erred in setting aside[8] any portion of the rehabilitation order in order to review the Fireside Holding transaction.

2. No Right of Action/No Cause of Action

The exception of no cause of action tests the legal sufficiency of the petition, raising the issue of whether the law affords any remedy to the plaintiff under the allegations thereof. White v. State, Dept. of Public Safety, 569 So.2d 1001, 1002 (La.App. 1st Cir.1990). Assuming a cause of action exists, the relevant inquiry in determining if a party has a right of action is whether he is a member of that class to whom the law affords a remedy. Jarrell v. Carter, 577 So.2d 120, 124 (La.App. 1st Cir.), writ denied, 582 So.2d 1311 (1991).
In support of its position that it had a right to attack the Fireside Holding transaction, FDIC relies on general principles of law relating to fiduciaries. Specifically, FDIC contends that the Commissioner failed in the duty he owed to Fireside and its creditors, as their fiduciary, "to enforce all causes of action belonging to Fireside and to recover property improperly transferred to Magnolia." According to FDIC's argument, FDIC was entitled to seek the return of the assets in question to Fireside's estate since the Commissioner refused to do so.
The trial court was persuaded by FDIC's argument, specifically ordering in the amended judgment of July 22, 1991 that FDIC be "permit[ted] to assert claims of the Commissioner *185 of Insurance as Rehabilitator for Fireside Commercial Life Insurance Company against Magnolia Life Insurance Company." This finding was erroneous. FDIC had no right of action nor cause of action to attack the Fireside Holding transaction in these proceedings in lieu of the Commissioner.
At the time pertinent herein, La.R.S. 22:732 et seq. provided a statutory scheme for the rehabilitation of domestic insurers.[9] If liquidation or rehabilitation is ordered under this scheme, the trial court directs the Commissioner of Insurance to take possession of the property, business, and affairs of the insurer and to rehabilitate or liquidate it, as the case may be. La.R.S. 22:735; State ex rel. Guste v. ALIC Corp., 595 So.2d 797, 799 (La.App. 2nd Cir.1992). The Commissioner is vested with title to "all property, contracts and rights of action of the insurer as of the date of the order directing rehabilitation or liquidation." La.R.S. 22:735. As rehabilitator, the Commissioner is the proper party to sue to enforce any right of a domestic insurer in rehabilitation. La.C.C.P. art. 693.
This statutory scheme for the liquidation and/or rehabilitation of insurers is comprehensive and exclusive in scope. LeBlanc v. Bernard, 554 So.2d 1378, 1383 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1357 (1990). There is no place in this scheme for individual creditors to assert a cause of action vested in the Commissioner. The allowance of such individual claims clearly violates the exclusivity of this scheme and usurps the Commissioner's role therein. Accordingly, the trial court erred in allowing FDIC to assert a cause of action belonging to Fireside, which was vested by statute in the Commissioner. FDIC had no right of action to bring this claim.
FDIC also asserts that it had a right and a cause of action to seek return of the funds from Magnolia under the civil code and general principles of law. Specifically, FDIC maintains that it had a right to assert an oblique action against Magnolia since the requirements provided for this action in La. C.C. art. 2044 were met herein.[10] Additionally, FDIC cites La.C.C. art. 2030, which provides that a contract is "absolutely null when it violates a rule of public order." According to FDIC, the agreement to repay the debt of Fireside Holding Company with Fireside's assets was contra bonos mores as the payment of a thing not due by Fireside. Thus, FDIC contends, this agreement was an absolute nullity which may be invoked by anyone under La.C.C. art. 2030.
We disagree with these contentions. General principles of law do not afford a right of action or a cause of action to FDIC to attack the reinsurance agreement between Fireside and Magnolia. Since no privity of contract existed between Magnolia and FDIC, as Key's receiver, with respect to this agreement, FDIC has no right to attack the agreement on its own behalf. Further, FDIC is not entitled to have the agreement declared null under article 2030 or to bring an oblique action under article 2044 because these are general provisions of law which are not applicable to an insurer in rehabilitation. As discussed above, Louisiana has enacted a statutory scheme specifically designed for insurance insolvency, which takes precedence over general law to the extent that the general law is inconsistent with the provisions or purpose of the comprehensive, statutory scheme. See, Green v. Louisiana Underwriters Ins. Co., 571 So.2d 610, 615-616 (La. *186 1990); Crist v. Benton Casing Service, 572 So.2d 99, 102 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1143 (1991). Allowing an individual creditor to bring either a direct action against a reinsurer to void a reinsurance contract or an oblique action against the reinsurer as a result of that contract clearly would be inconsistent with the comprehensive nature of Louisiana's statutory scheme for insurer rehabilitation.

CALKEY LOAN
FDIC contends the trial court judgment should be affirmed on the alternate ground of FDIC's ownership, as receiver for Key, of a participation interest in the Calkey loan. In its answer to this appeal, FDIC argues the trial court erred in finding the transaction between Fireside and Key was a loan to Fireside rather than a sale to Key of a participation interest in the Calkey loan. According to FDIC's argument, this classification is critical because if "the transaction is classified as the sale or assignment of an interest in the loan, the participant is recognized as having an ownership interest in the underlying loan and that interest, and associated funds, are excluded from the failed lender's assets." However, if the transaction is characterized as a loan from the participant to the lead lender, the participant is relegated to the status of an unsecured creditor "without any claim to specific funds". Although this issue is res nova in Louisiana, there is some jurisprudential support for FDIC's position regarding the legal effect of this characterization. See, Franklin v. C.I.R., 683 F.2d 125, 128-129, n. 9 (5th Cir. 1982); Federal Deposit Ins. Corp. v. Mademoiselle of California, 379 F.2d 660, 665 (9th Cir.1967).
The following facts were established regarding the transaction between Fireside and Key. On January 4, 1983, Fireside made a loan to Calkey, Inc. for $470,000.00. On November 3, 1983, Key paid Fireside $270,000.00, and Fireside issued a "participation certificate" reflecting that Key had purchased a 68.14 percent interest in the Calkey loan. That same day, Fireside's president wrote a letter to Key stating that, "Fireside... unconditionally and absolutely agrees to repurchase from Key ..., in whole or in part, that certain loan participation purchased by Key ... on November 3, 1983, of an undivided participation interest" in the Calkey loan. It further stated that, "This letter is deemed an amendment in writing to the Participation Agreement dated November 3, 1983, covering the participation described herein." FDIC stipulated that Key subsequently made demands on Fireside, pursuant to this agreement, to repurchase its interest in the Calkey loan.
The record is not clear as to how Fireside resolved these demands. In any event, it continued to remit 68.14 percent of the monthly payments made on the Calkey loan to Key through December, 1986. Although the participation agreement provided that Fireside had the right to deduct a one-half (.5%) percent per annum service fee from these monthly payments, it did not do so. Additionally, the interest rate Fireside remitted to Key in conjunction with these payments was different from the interest rate paid by Calkey on the underlying loan.[11]
During 1987, Fireside did not remit to Key any part of the monthly payments made by Calkey. The balance on the Calkey loan was paid off by a check to Fireside for $373,233.71, which was deposited into Fireside's operating account on June 8, 1987. Fireside did not remit any part of the payoff proceeds to Key, on the basis that it was entitled to a set-off against these funds for certain expenses it felt Key owed it on an unrelated transaction.
As previously noted, on June 24, 1987, Magnolia received a check from Fireside for $470,000.00, drawn on the same account into which the payoff proceeds had been deposited. FDIC argues that this check was drawn on funds which included Key's portion of the payoff proceeds. It maintains that, since these funds never belonged to Fireside, they *187 could not validly be transferred to Magnolia by Fireside.
A determination of the legal relationship between a lead lender and a participant is dependent on a judicial interpretation of the agreement between the parties, which may depend on the court's factual conclusions concerning the knowledge, expectations and intentions of the parties. Teachers' Retirement System v. La. St. Employees, 456 So.2d 594, 598 (La.1984). In written reasons for judgment rendered on April 10, 1991[12], the trial court reached the following conclusions regarding the agreement between Fireside and Key:
Loan Participation Agreements are used extensively throughout the banking industry. There appears to be no legislation, however, concerning the nature of the interest created by the agreement. Does the purchaser of a loan participation own that portion of the proceeds? This is an extremely important issue. In the absence of legislation the Court may determine whether custom has been created by repeated practice. LSA-C.C. Art. 3. The Comptroller of the Currency issued a regulation found at 12 C.F.R. Sec. 32:103(b):
The purchase of other types of security subject to an agreement that the seller will repurchase at the end of a stated period is regarded as a loan from the purchasing bank to the seller and not as an obligation of the underlying obligor of the security.
In a publication put out by the American Bankers Association entitled, "A Bankers Guide to Loan Participation" (1986), at p. III-16, repurchase agreements are discussed as follows:
The [participation] agreement must clearly indicate that the lead bank is under no obligation whatsoever to repurchase the participation interest from the participating bank.
The Comptroller of the Currency has consistently taken the position that loan participation involving national banks subject to any formal or informal repurchase agreement are not true loan participation, but are actually extensions of credit by the participating bank to the lead banks.
If the "lead bank," Fireside, was required to repurchase the interest sold to the "participating bank", Key, then the transaction would be considered a loan and not a sale. The Court is aware that Fireside and Key are not banks and are not subject to these regulations. However, commercial law should be consistent. The Court, therefore, finds that there is custom in the banking industry concerning participation agreements and that the custom in the banking industry should apply by analogy to similar transactions to insure uniformity in commerce.
By letter dated November 3, 1983, Fireside unconditionally agreed to repurchase the Calkey loan upon thirty days notice from Key. (Magnolia Exhibit 2). By letter date April 12, 1984, Key made demand upon Fireside to repurchase the participations. (Magnolia Exhibit 6). The participation agreement is therefore a loan from Key to Fireside and not a sale.
We find no error in the trial court's conclusions. In a typical participation, the rate of return received by the participant is based on the interest rate paid by the borrower on the underlying loan, minus a deduction for a reasonable service fee. See, In Re Woodson Co., 813 F.2d 266, 272 (9th Cir. 1987). However, in the present case, the agreement between the parties provided for a per annum yield to Key which was different from the interest rate earned on the underlying loan. Furthermore, Fireside charged no service fee to Key, although it was stipulated that the agreement between the parties authorized a service fee. This arrangement is incompatible with the basic concept of participation and is suggestive of a debtor-creditor relationship. In Re Woodson, 813 F.2d at 272; In Re S.O.A.W. Enterprises, Inc., 32 B.R. 279, 282 (Bankr.W.D.Tex.1983).
*188 Additionally, a true participation envisions the parties sharing pro rata not only in the benefits of the underlying loan, but also in its risks. In Re S.O.A.W., 32 B.R. at 282. Since the repurchase agreement by Fireside specifically provided that it was not limited by any conditions other than thirty days prior notification, Key could require Fireside to repurchase its "interest" in the Calkey loan at anytime and for any reason. Obviously, this unconditional agreement to repurchase Key's interest in the underlying loan upon Key's request substantially limited Key's risks with respect to the underlying loan. Thus, there was not a true pro rata allocation of risks between the parties.
After a thorough review of the relevant documents and the circumstances involved herein, we find no error in the trial court's conclusion that the transaction in question was a loan to Fireside rather than the purchase of an true participation interest in the Calkey loan.

CONCLUSION
For the above reasons, judgment is hereby rendered reversing that portion of the trial court judgment in favor of FDIC which ordered Magnolia to pay FDIC $268,803.35, plus legal interest. Those portions of the trial court judgment permitting FDIC to assert the claims of the Commissioner, as Rehabilitator for Fireside, and partially rescinding the rehabilitation order rendered on July 9, 1987, are also reversed. Additionally, the assessment of trial court costs to Magnolia is reversed and it is ordered that these costs, as well as the costs of this appeal, are to be paid by FDIC. Finally, the judgment of September 30, 1991, is amended to correct a typographical error by substituting "Federal Deposit Insurance Corporation" in place of the erroneous designation of "Fidelity Deposit Insurance Corporation" in paragraph two of that judgment. The judgment of the trial court is affirmed in all other respects.[13]
REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART.
CARTER, J., concurs with reason.
CARTER, Judge, concurring.
Although I disagree with the rationale in certain parts of the majority opinion, I agree with the result reached by the majority. The rehabilitation order of July 9, 1987, was a final judgment at the time that FDIC intervened. Therefore, to avoid the effect of the judgment, FDIC should have filed a direct action to have the judgment annulled.
NOTES
[1] With the exception of certain policies previously reinsured by another insurance company.
[2] The Commissioner asserts that the trial court instructed its counsel not to participate in these proceedings because there was no need to incur additional costs to the State since this matter was essentially one between FDIC and Magnolia. However, FDIC contends that the Commissioner, through his counsel, requested that he be allowed to limit his participation in these proceedings and, that the trial court never prohibited the Commissioner's participation therein. Although the trial court commented on this issue at the June 7, 1991 hearing on FDIC's motion for new trial, its comments did not clearly resolve this conflict. However, in view of our conclusion that the judgment of the trial court is reversible on other grounds, we pretermit consideration of this issue.
[3] La.R.S. 22:745 was amended and reenacted by Acts 1991, No. 1031 as La.R.S. 22:825. All references in this opinion to R.S. 22:745 B are to that provision as it existed prior to its redesignation (without substantive change) by Act 1031. At the time in question, R.S. 22:745 B provided that:

Any transfer of, or lien upon, any property of any insurer made or created within four months prior to the filing of a petition for an order to show cause under this Part, which gives to any creditor or policyholder or enables him to obtain a greater percentage of his debt than any other creditor or policyholder in the same class, which is accepted by a creditor or policyholder having reasonable cause to believe that such a preference will occur, shall be voidable. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer if by law such recording or registering is required.
[4] FDIC has asserted throughout these proceedings that its claim is not based on La.R.S. 22:745, which it maintains is not applicable herein.
[5] FDIC also seeks to have the trial court judgment modified to provide that Magnolia should pay the awarded funds to the Commissioner, rather than directly to FDIC, and that the Commissioner should then pay FDIC $268,803.35.
[6] The amended reinsurance agreement of January 2, 1987 states that this transfer of assets was also in satisfaction of the twenty percent servicing fee Fireside owed to Magnolia for the collection of the premiums due on Fireside's policies from September through December, 1986.
[7] In fact, it appears that a hearing was not held on the reinsurance plan prior to the trial court signing the order. Through a resolution of its board of directors, Fireside waived notice and appearance at any hearing held on the submitted plan.
[8] In the amended final judgment it rendered on July 22, 1991, the trial court "rescinded" the July 9, 1987 rehabilitation order to the extent that it was inconsistent with that judgment.
[9] The Louisiana Insurance Code (Title 22) was amended and reenacted in its entirety by Acts 1991, No. 1031. Under this revision, the provisions dealing with the rehabilitation of domestic insurers were redesignated as La.R.S. 22:811 et seq. Section 3 of Act 1031 provided that the act was to become effective January 1, 1993. Since Act 1031 became effective after the dates pertinent herein, all references in this opinion to Title 22 are to the cited provisions as they existed prior to the revision effected by Act 1031. In any event, we note that the Act 1031 revision did not effect any substantive changes in the cited provisions, insofar as they are pertinent herein.
[10] La.C.C. art. 2044 provides, in pertinent part, that: "If an obligor causes or increases his insolvency by failing to exercise a right, the obligee may exercise it himself, unless the right is strictly personal to the obligor."

FDIC asserts that this article applies to this case because Key was a creditor of Fireside, which "caused or increased its insolvency by transferring assets in the amount of $1,141,300 to Magnolia which the District Court found was greater than that required under the Reinsurance Plan to protect the policyholders."
[11] The promissory note executed by Calkey, Inc. on January 4, 1983, provided for an interest rate of twelve (12%) percent per annum, while the participation certificate issued to Key by Fireside on November 3, 1983, provided that Key's "Yield rate per annum, net" would be "Citibank Prime + 2%".
[12] Although the trial court later amended the judgment rendered in accordance with these reasons, it did so on an entirely different ground, while expressly stating that the remainder of the reasons rendered on April 10, 1991 were correct (with the further exception of its finding that the Fireside Holding transaction was contra bonos mores).
[13] Considering our disposition of this matter, we pretermit all other issues raised by the parties.