**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 8, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: BROOKE CAPITAL
CORPORATION,

      Debtor.

---------------------

CITIZENS BANK & TRUST
COMPANY,

      Plaintiff - Appellant,

v.

SECURITY FIRST INSURANCE
HOLDINGS, LLC, a Florida limited
liability company; SOUTHERN
FIDELITY MANAGING AGENCY,
LLC, a Florida limited liability
company; NORTHERN CAPITAL,
INC., a Florida corporation,

      Defendants - Appellees.

No. 14-3017
(D.C. Nos. 2:12-CV-02702-JTM and
2:12-CV-02707-JTM-DJW)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO**, and **MATHESON**, Circuit Judges.

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

At the core of this case is a priority dispute over collateral sold in bankruptcy. Plaintiff-Appellant Citizens Bank & Trust Company (Citizens) sought a declaratory judgment that it had superior rights to the collateral—sale proceeds of certain stock—owned by the debtor in bankruptcy. The bankruptcy judge found largely in favor of Citizens and against various competing creditors including Defendant-Appellees Southern Fidelity Managing Agency, LLC, Security First Insurance Holdings, LLC, and Northern Capital, Inc. In re Brooke Capital Corp., Bankr. No. 08–22789–7, 2012 WL 4793010 (Bankr. D. Kan. Oct. 5, 2012). The district court reversed, however, adopting the report and recommendation of a magistrate judge. S. Fid. Managing Agency, LLC v. Citizens Bank & Trust Co., Nos. 12–2702–JTM, 12–2707–JTM, 2014 WL 129336 (D. Kan. Jan. 14, 2014). The magistrate determined that the competing creditors had been assigned perfected security interests in the stock pursuant to Kan. Stat. Ann. § 84-9-310(c). Citizens now appeals from the district court's decision. Our jurisdiction arises under 28 U.S.C. § 158(d)(1), and we reverse and remand for reinstatement of the bankruptcy judge's decision.

Background

A.    BCC's Loans and the Subsequent Loan Participation Agreements

On December 31, 2007, Brooke Capital Corporation (BCC) obtained a $12.38 million loan (the BCA Loan) from Brooke Capital Advisors (BCA), a

majority-owned subsidiary of BCC. The loan was memorialized in a Commercial Loan Agreement and a Stock Pledge and Security Agreement. As security for the BCA Loan, BCC granted BCA a security interest in one-hundred percent of BCC's "right, title, and interest" in First Life America Corporation (FLAC), another of BCC's subsidiaries. Aplt. App. 102, 140, 146.

On the same date, BCC also obtained a $9 million loan from Citizens (the Citizens Loan) with a maturity date of May 31, 2008, a substantially shorter term than the BCA Loan. Id. 217. The Citizens Loan was secured by stock in other BCC affiliates, but not FLAC.

In March 2008, BCA began selling fractional interests or, "participations," in its loan to BCC. Three of these participation agreements were executed on March 28 (the Participation Certificates). These agreements, with Defendant-Appellees Northern Capital, Security First Insurance Holdings, and Southern Fidelity Managing Agency (collectively, Participants) were virtually identical. The one difference was the size of the interest purchased: Northern Capital purchased an 8.07% interest for $1 million, Security First purchased a 40.4% interest for $5 million, and Southern Fidelity purchased a 24.22% interest for $3 million.

At the time these agreements were entered into, each Participant owed an outstanding debt to Brooke Credit Corporation, d/b/a Aleritas Capital Corporation (Aleritas), a BCC sister company. Each Participant had received a similar

-3-

promise from Aleritas in connection with its purchase of a participating interest: if BCC or BCA defaults, "the participation amount will be applied to principal and interest on [Participant's] current loan outstanding with Aleritas Capital." Aplt. App. 167.

Pursuant to the Participation Certificates, BCA would make payments to the Participants on a pro-rata basis as BCC made payments on the underlying loan. A critical term of the deal, however, required BCA to *repurchase* each of the Participants' interests by September 30, 2008.[1] Id. 166, 171, 192.

Insofar as collateral, the Participation Certificates provide:

7. SECURITY. The [BCA Loan] is secured by the following Property, all of which is evidenced by executed security agreements, assignments, mortgages, deeds of trust or other instruments in favor of [BCA]. A security interest in the Property is assigned and sold to Purchaser [Participant], subject to other provisions within this Agreement, in proportion to [Participant's] Investment and is held by [BCA] for the benefit of [Participant]. Upon full payment of [Participant's] investment plus interest thereon the security interest given to Purchaser will be null and void.
Property description: . . . Pledge of 100% stock of First Life America Insurance Company.

Aplt. App. 164, 169, 188. BCA also made the following covenants, pursuant to Paragraph 12(A) of the agreements:

Seller will not, without Purchaser's written consent, reduce principal or interest with respect to the [BCA Loan] or release or allow for the substitution of any Property, outside the normal course of dealing

---

[1] The initial repurchase date was June 20, 2008. The date was later extended pursuant to signed addenda. See Aplt. App. 166, 171, 192.

with Borrower so as to substantially reduce the possibility of repayment of the Loan.

Aplt. App. 165, 170, 189.

A fourth participation was purchased by First National Bank of Johnson County, predecessor to Defendant Bank of Kansas (BoK).[2] BoK obtained a 14.54% interest in the BCA Loan for $1.8 million. Like the other agreements, this agreement (the BoK Participation) purported to sell and assign a security interest in the FLAC stock. Additionally, it contained the same covenants contained in Paragraph 12(A) of the Participation Certificates, above. In total, BCA had sold 86.87% of the BCA Loan during the month of March.

Other terms of the BoK Participation differed materially from those of the Participation Certificates. See In re Brooke Capital Corp., 2012 WL 4793010, at *5–6. BCA had no obligation to repurchase BoK's interest in the BCA Loan at any time. There was no evidence that BoK was in debt to any Brooke entities; accordingly, there was no promise that a pre-existing debt would be credited in the event of a BCC or BCA default. Additionally, BoK was entitled to receive a pro-rata share of borrower fees and was required to share in ancillary loan

---

[2] In general, we refer to BoK separately from Participants. Unlike Participants, BoK is not a party to this appeal. BoK initially appealed but, on October 23, 2012, an amended notice of appeal was filed that removed BoK as an appellant. Citizens has not cross-appealed from that part of the bankruptcy court's order ruling on BoK's interests. Citizens indicated that it has settled with BoK. Aplt. Br. 42.

servicing expenses—rights and obligations that did not exist in the Participation Certificates.

B.     The Workout Agreement

Shortly after BCC executed its loan agreements with Citizens and BCA, BCC began to experience financial difficulties and sought an extension on the May 31, 2008 maturity of the Citizens Loan. Citizens and BCC began "workout" discussions in an effort to accommodate BCC's financial problems.

In an early communication between Citizens and BCC, BCC informed Citizens that it had long-term debt with BCA secured by its pledge of FLAC stock. BCC proposed a collateral swap that would meet both of the creditors' needs. In essence, BCC informed Citizens that BCA was willing to release its lien on the FLAC stock so that Citizens could be paid from the sale proceeds of FLAC, when it sold.

As BCC and Citizens began working out the details of this deal, Citizens requested confirmation that BCA was willing to release its lien on the FLAC stock. It also inquired whether BCA had any creditors with a lien on its assets, including its security interest in FLAC. Aplt. App. 229. BCC responded that BCA had no creditors with a lien on assets, including the FLAC stock, and confirmed that BCA would release its lien on that stock when (1) the FLAC stock was sold; (2) Citizens released its lien on BCC's other assets securing the original Citizens loan; and (3) Brooke Corporation pledged Citizens' former collateral to

-6-

BCA.  Id. 227, 230.

On June 19, 2008, Citizens formally proposed terms and conditions of a new deal.  Id. 235.  Among other things, Citizens required "full agreement" from BCC and BCA that one-hundred percent of the sale proceeds of FLAC would be applied to the Citizens Loan.  Id.  BCC accepted the offer and documents (the Workout Documents) were prepared to memorialize the terms of the new deal.  These documents included a Second Amendment to Promissory Note, a Security Agreement, a financing statement (UCC-1) filed by Citizens, and a Payment Agreement.  Neither the June 19 offer nor the Workout Documents appear to indicate that Citizens' release of its original collateral was a term of the new agreement.

The Payment Agreement was BCC and BCA's written promise to apply FLAC sale proceeds to the Citizens Loan.  The document was signed by representatives of both BCC and BCA.  It provides:

> If, in connection with any sale or other disposition of any equity interests or assets of FLAC, [either BCC or BCA] is entitled to receive, directly or indirectly, any proceeds from such sale or disposition, [that company] shall immediately pay such proceeds to [Citizens] to the extent necessary to satisfy all principal, interest and any other amounts then due [Citizens] by [BCC].

Id. 237.

BCC and Citizens also executed a Security Agreement, dated June 25, 2008.  The Security Agreement grants Citizens a security interest in *all* of BCC's

-7-

personal property, including investment property such as the FLAC stock.  Id.
240–48.  Citizens filed a financing statement the next day which described the
collateral as "All assets."  Id. 424.

Thereafter, Citizens inquired as to who was in possession of the FLAC
stock and whether Citizens, or some other third party, could hold the stock so that
Citizens could perfect its interest by control.  Id. 278–79.  Carl Baranowski,
counsel for BCC and BCA, responded that he was holding the FLAC stock on
behalf of BCA, "the first lienholder."  Id. 279.  He also informed Citizens that the
loan participants would likely object to Citizens holding the FLAC stock.  As a
concession, he offered to have the stock placed in escrow.  This was the first that
Citizens learned of the BCA loan participations.  Nevertheless, Citizens agreed to
have the stock placed in escrow.

On June 27, Citizens followed up on the previous communications.
Citizens inquired about the identity of the participants and asked, "wouldn't the
existence of participants impair [BCA's] ability to apply the proceeds from a sale
of FLAC stock to pay the Citizens debt?"  Id. 275.  Mr. Baranowski responded:

> Paying off Citizens with FLAC sale proceeds is OK because paying
> off Citizens frees up much collateral, and the participants have
> agreed to take only part of that freed collateral in substitution for
> FLAC, freeing up the rest of the collateral for other corporate
> purposes.  Even though they are willing to substitute collateral,
> FLAC hasn't sold and Citizens hasn't been paid off yet, and until all
> that happens, they aren't willing to give up their lien position.

Id.  In Mr. Baranowski's opinion, the collateral swap had two economic

underpinnings: (1) the BCC stock that would serve as the "new" collateral for the BCA Loan had to be worth more than the FLAC stock; and (2) the FLAC proceeds, coupled with additional cash from "Brooke," had to be sufficient to pay off the Citizens Loan, so that Citizens would release its original collateral. Aplt. App. 747. Citizens was apparently satisfied with Mr. Baranowski's response.

Citizens, BCA, and BCC executed an Escrow Agreement on June 30, 2008, that placed approximately 1.5 million shares of FLAC common stock in escrow. The Escrow Agreement states that the stock was being placed in escrow to perfect Citizens' and BCA's security interests. Id. 250. The agreement identifies BCA as "First Lien Lender" and Citizens as "Second Lien Lender," and acknowledges that BCA has consented to Citizens' lien. Id.

In the summer of 2008, the value of BCC and FLAC stock dropped rapidly. FLAC's value decreased to the extent that BCC no longer had enough cash to supplement potential FLAC proceeds to pay off the Citizens Loan.

In September 2008, BCC and several other entities were sued in federal court. A special master was appointed to take control of BCC and subsequently filed a Chapter 11 petition on BCC's behalf. The special master, now trustee, filed a motion to sell the FLAC stock. The motion was granted and the stock was sold for $2.5 million. In June 2009, BCC's bankruptcy was converted to a Chapter 7 proceeding. The instant action followed.

C.   Proceedings in the Bankruptcy Court

As noted, Citizens filed this declaratory judgment action in bankruptcy court to determine priority rights to the FLAC proceeds. Following a three-day trial on the merits, the bankruptcy judge issued detailed findings of fact and conclusions of law. In re Brooke Capital Corp., 2012 WL 4793010. We address only those issues pertinent to the immediate appeal.

The bankruptcy court made several findings with regard to Citizens' interest in the FLAC proceeds. As an initial matter, the court concluded that Citizens' claim to the proceeds was superior to BCA's; the express terms of the Payment Agreement effectively subordinated BCA's interest to Citizens'.

More importantly, the court considered whether Citizens' claim was superior to the claims of the Participants and BoK. Central to the court's analysis was whether the participation agreements should be recharacterized as loans. If the transactions were true participations, rather than loans, the participants would be able to rely on BCA's perfection in the FLAC stock to protect their interests.

The court concluded that the Participation Certificates were disguised loans, rather than true participations. As such, Participants were creditors of BCA who needed to take additional steps to perfect in some collateral. It is undisputed that Participants have never filed a financing statement or personally possessed any collateral. Thus, the court concluded that Participants held (at best) unperfected security interests that lose in a priority battle with Citizens, a perfected lien lender. It also noted that it was "mak[ing] no ruling about the

-10-

specific property in which the three holders of the Participation Certificates were granted security interests under the recharacterized certificates." Id. at *16 n.25.

The bankruptcy court reached a different conclusion with regard to the BoK Participation. Noting material differences between the BoK Participation and the Participation Certificates, the court concluded that BoK purchased a true participation. As a true participant, the question then became whether BoK, a non-party to the Payment Agreement, could be subordinated by BCA's execution of the Payment Agreement. The court found that BCA was expressly precluded from subordinating its interests in the collateral without BoK's consent. BoK never gave that consent. Thus, BoK was not bound by the Payment Agreement and its assigned, perfected security interest in 14.54% of the FLAC stock was superior to Citizens' interest.

D.    Proceedings in the District Court

The Participants appealed from the bankruptcy court's order. The district judge referred the appeal to a magistrate judge, who issued a report and recommendation on September 3, 2013 (R&R). Aplt. App. 1212. The R&R largely disagreed with the bankruptcy court's legal conclusions and recommended reversal. The district court agreed and therefore adopted and incorporated the magistrate's recommendations.

The district court held that the Participants had perfected security interests in the FLAC stock and that such interests were superior to Citizens' interest in the

same.  It reasoned that application of Kan. Stat. Ann. § 84-9-310(c), which the

bankruptcy court "fail[ed] to apply," was outcome determinative.  S. Fid.

Managing Agency, LLC, 2014 WL 129336, at *2.  That section provides:

> **Assignment of perfected security interest.**  If a secured party
> assigns a perfected security interest or agricultural lien, a filing
> under this article is not required to continue the perfected status of
> the security interest against creditors of and transferees from the
> original debtor.

Kan. Stat. Ann. § 84-9-310(c).  The district court reasoned that because the

Participation Certificates employ express language of assignment in transferring a

perfected security interest in FLAC stock, the Participants were not required to

take additional steps to protect their interests.  The district court rejected

Citizens' argument that recharacterization of the Participation Certificates as

loans rendered § 84-9-310(c) inapplicable.

The district court likewise rejected Citizens' argument that, even if § 84-9-

310(c) applies, the Participants are not perfected as against Citizens.  Citizens

maintains that assignees of perfected security interests are not perfected against

creditors and transferees *of the lender* (here, BCA).[3]  According to Citizens,

---

[3]  The comment to § 84-9-310 explains:

Subsection (c) applies not only to an assignment of a security interest
perfected by filing but also to an assignment of a security interest
perfected by a method other than by filing, such as by control or by
possession.  Although subsection (c) addresses explicitly only the
absence of an additional filing requirement, the same result normally
will follow in the case of an assignment of a security interest

-12-

Citizens became a *transferee* of BCA when those two parties executed the

Payment Agreement, transferring BCA's rights to receive the FLAC sale

proceeds. Thus, even if § 84-9-310(c) did apply, the Participants were required to

take additional steps to perfect against Citizens, as transferee of BCA. Looking

to the transactions and the plain language of § 84-9-310(c), however, the district

court concluded that Citizens was simply a creditor of the original debtor (BCC),

not a transferee of BCA. As such, the Participants could rely upon § 84-9-310(c)

and BCA's perfection.

On appeal, Citizens argues that (1) both the magistrate judge and the

district judge failed to account for the consequences of recharacterization vis-a-

vis the collateral and its proper perfection, (2) Kan. Stat. Ann. § 84-9-310(c) does

not apply to this case, and (3) the Payment Agreement was effective against the

Participants.

## Discussion

perfected by a method other than by filing. For example, as long as possession of collateral is maintained by an assignee or by the assignor or another person on behalf of the assignee, no further perfection steps need be taken on account of the assignment to continue perfection as against creditors and transferees of the original debtor. *Of course, additional action may be required for perfection of the assignee's interest as against creditors and transferees of the assignor.*

Kan. Stat. Ann. § 84-9-310, cmt. 4 (emphasis added).

In essence, this appeal involves three distinct, but interrelated, issues:

(1)    What effect, if any, does recharacterization have on the Participation Certificates and the security interests purportedly assigned therein?

(2)    Are the Participants perfected as against Citizens pursuant to Kan. Stat. Ann. § 84-9-310(c), or is Citizens a "transferee" of BCA such that the Participants needed to take additional steps to perfect against them?

(3)    What is the effect, if any, of the Payment Agreement on the rights of the parties?

Because we agree with Citizens that recharacterization of the Participation Certificates from true participations to loans renders Kan. Stat. Ann. § 84-9-310(c) inapplicable, we reach only the first of these questions.

We review the legal conclusions of both the district court and the bankruptcy court de novo.  In re Paige, 685 F.3d 1160, 1178 (10th Cir. 2012); In re Peterson Distrib., Inc., 82 F.3d 956, 959 (10th Cir. 1996).  We overturn the bankruptcy court's findings of fact only if clearly erroneous.  In re Paige, 685 F.3d at 1178.  Despite the fact that the parties quarrel over inferences to be drawn from the bankruptcy court's findings of fact, neither party challenges the facts as set forth above.

A.    Recharacterization and Perfection of Security Interests Under Revised Article 9 of the U.C.C.

Central to this appeal is the concept of recharacterization.  The bankruptcy court determined in its final order that the alleged participations should be recharacterized as loans.  In re Brooke Capital Corp., 2012 WL 4793010, at

-14-

*15–16. The Participants challenged this ruling on appeal to the district court, but that court found that, recharacterized or not, the Participants had perfected security interests in the FLAC stock pursuant to Kan. Stat. Ann. § 84-9-310(c). In their briefing before this court, the Participants no longer argue that recharacterization was improper; rather, they argue that the recharacterization has no effect on whether BCA's security interest in FLAC was assigned. Indeed, as the briefs make clear, the present dispute is not over the issue of recharacterization itself, but rather concerns only the *consequences* of recharacterization. We therefore proceed to the issue of what effect, if any, recharacterization has on the Participants' ability to attain automatic perfection pursuant to Kan. Stat. Ann. § 84-9-310(c).

Citizens argues that there are two important consequences of recharacterization. First, the terms of the Participation Certificates are recast as lending terms to reflect the true nature of the transaction. Second, the Participants, now treated as creditors, must perfect in some asset or assets of BCA. Thus, Citizens contends the Participation Certificates represent lending transactions whereby the Participants received either a security interest (1) in BCA's right to receive payments from BCC (a payment intangible), or (2) in BCA's security interest in the FLAC stock (a security interest *in* a security interest—a general intangible). Aplt. Br. 44. According to Citizens, there was no true assignment of BCA's security interest in FLAC.

-15-

Both the district court and the Participants reject Citizens' view of how recharacterization affects the outcome of this case. According to the Participants, "BCA did not merely grant Participants a security interest in the FLAC stock. BCA expressly assigned its security interest in the FLAC stock to the Participants." Aplee. Br. 19–20. Participants then argue that they are entitled to the benefits of automatic perfection pursuant to § 84-9-310(c). The core of this dispute, then, is on what the Participation Certificates did or did not transfer. As we shall explain in more detail below, we reject the Participants' attempt to place near dispositive reliance on the assignment provisions in the agreements without regard to the economic substance of the transactions. It is clear that in a transaction such as this, what the agreement assigned or did not assign must be evaluated against a backdrop of the economic and commercial reality of the transactions.

We begin our analysis by setting forth the nature of the lending transactions that led to this dispute. In the BCA Loan, BCC is the debtor and BCA is the creditor. The collateral is the FLAC stock. Thereafter, the Participants loaned funds to BCA.[4] In this transaction, BCA is the debtor and the Participants are the

---

[4] Were this a true sale or loan participation, the Participants' argument that they had a perfected security interest in collateral securing the BCA Loan, the FLAC stock, would be more persuasive given Kan. Stat. Ann. § 84-9-309(3) (automatic perfection). Again, however, the Participants make no argument that recharacterization is improper.

-16-

(secured) creditors.  Thus, we have two different debtors in the two transactions.

For a secured party's interest to be enforceable against the debtor and third parties, the debtor must have had "rights in the collateral or the power to transfer rights in the collateral."  Kan. Stat. Ann. § 84-9-203(b).  Here, BCA had a security interest in the FLAC stock.  We do not doubt that BCA could validly sell or assign that interest.  However, it is also clear that if there was anything short of a true sale or assignment, BCA could not grant a security interest in the FLAC stock itself because BCA did not own the stock (BCC did), and BCC was not the debtor vis-a-vis the Participants (BCA was).  But this does not mean that BCA could not grant the Participants a security interest in something else.  Short of a true sale or assignment, there are two types of collateral or property in which BCA might grant a security interest.  The first is a payment intangible, the right to receive payments from BCC under the BCA loan.[5]  See Kan. Stat. Ann. § 84-9-102(a)(61).  The second is BCA's security interest in the FLAC stock, which is a general intangible.  See id. § 84-9-102(a)(42).  As the cases below illustrate, the Participation Certificates grant the Participants a security interest in something other than the FLAC stock.

In Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc. (In re

_____

[5]  We note that once a security interest attaches to the payment intangible, so too does a security interest in its underlying collateral.  See Kan. Stat. Ann. § 84-9-203(g).

S.O.A.W. Enters., Inc.), S.O.A.W. purchased large tracts of land, subdivided those tracts, and sold the smaller tracts under "Agreements for Deed." 32 B.R. 279, 281 (Bankr. W.D. Tex. 1983). The buyers of the subdivided tracts remitted payments to S.O.A.W. until the purchase price was fully paid. To generate operating capital, S.O.A.W. executed a "Participation Agreement" with Castle Rock. Id. Under the Agreement, S.O.A.W. purported to *sell* the Agreements for Deed to Castle Rock. In reality, however, Castle Rock was only entitled to 30% of each agreement for deed's overall purchase price. Castle Rock would simply retain possession of the "purchased" agreements for deed and, until it received its 30% interest, was entitled to all payments made by the original purchasers. Id.

When S.O.A.W. filed for bankruptcy, Castle Rock asserted its rights as the owner of the Agreements for Deed. The bankruptcy court recharacterized the Participation Agreement as a loan agreement "secured by collateral." Id. at 283. The collateral, however, was not the agreements for deed. Rather, the security interest was "essentially the right to collect all sums due from vendees under the various Agreements for Deed," a "general intangible" under the pre-Revised Article 9 U.C.C. Id. at 283–84. Once the court established that Castle Rock had a security interest in general intangibles, the court considered whether that interest was perfected under the U.C.C. Id. at 285. The court determined that, because Castle Rock had failed to file a financing statement, it "was an unperfected secured creditor." Id.

-18-

Likewise, in <u>In re Commercial Money Center, Inc.</u>, debtor Commercial Money Center (CMC) "packaged groups of leases together and *assigned* its contractual rights to future lease payments" to participant, NetBank. 350 B.R. 465, 469 (B.A.P. 9th Cir. 2006) (emphasis added). NetBank was also granted a security interest in the underlying leases. Notably, the agreements expressly provided that the parties "intend that each assignment and transfer herein contemplated constitute a sale and assignment outright." <u>Id.</u> at 470.

Similar to this case, the court set out to answer the following questions: (1) was the transaction a true sale or a mere loan; (2) what interests did NetBank obtain in the transactions; and (3) had NetBank perfected its interests. <u>Id.</u> at 473.

The bankruptcy appellate panel (BAP) determined that the purported sales transactions were in fact loans. <u>Id.</u> at 481–82. More important for our present purposes, the BAP considered NetBank's arguments that it held perfected security interests in either chattel paper (the underlying leases) or payment intangibles. The BAP rejected the bankruptcy court's finding that NetBank had a perfected interest in "chattel paper" by possession or filing. Critically, in discerning the nature of the interest, the BAP examined the U.C.C. definition of chattel paper *and* the financial reality of what NetBank received under the agreements. <u>Id.</u> at 475–77.

The BAP concluded that what NetBank actually received were carved out payment streams—in essence, monetary obligations. Based on this determination,

-19-

the BAP held that NetBank was granted a security interest in a payment intangible. Id. at 476. Under Revised Article 9, a payment intangible is defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation." Kan. Stat. Ann. § 84-9-102(a)(61). As the official comments to that section advise, "[i]n classifying intangible collateral, a court should begin by identifying the particular rights that have been assigned." Id. cmt. 5. CMC's principal obligation to NetBank was indeed a monetary one.

We agree with the analysis in the foregoing cases that, upon recharacterization, a court must look beyond the language of the agreement to determine the true nature of the interest granted. See Fireman's Fund Ins. Co. Grover (In re Woodson Co.), 813 F.3d 266, 272 (9th Cir. 1987). In this case, the district court gave near dispositive weight to the fact that the Participation Certificates employed language of sale and assignment. S. Fid. Managing Agency LLC, 2014 WL 129336, at *5–6. But, as we have just seen, recharacterization requires us to look at substance over form. Participants' argument that the recharacterization cases, In re S.O.A.W. and In re Commercial Money Center, are inapposite because they involved different ultimate issues is unavailing. Aplee. Br. 20. Merely asserting that these cases are inapplicable because they considered whether certain collateral was property of the bankruptcy estate under 11 U.S.C. § 541(d) is not a sufficient basis to brush aside the applicable legal reasoning therein. In each of these cases, the court's determination of the nature

of interest was essential to the court's determination of priority. The district court failed to adequately consider the security interests the Participants received in the recharacterized transactions.

Employing the approach of In re S.O.A.W. and In re Commercial Money Center, we hold that Participants received security interests in both a payment and general intangible. When we look to the "particular rights that have been assigned," Kan. Stat. Ann. § 84-9-102(a)(61) cmt. 5, it is clear that BCA's "principal obligation" to the Participants is a monetary obligation. Id. § 84-9-102(a)(61). The recharacterized agreements obligate BCA to repurchase the Participants' interests at the end of a six-month term (initially, three months). The Participation Certificates call for BCA to administer and service the BCA Loan, and do not grant Participants any right to share in borrower fees. Perhaps most significantly, the Participants' security interests *terminate* when BCA fully pays off the Participants' loans. See, e.g., Aplt. App. 164. Participants do not retain *any* interest, security or otherwise, in the FLAC stock. What, then, did Participants get? In return for their loans, Participants obtained security interests in "a general intangible under which [BCA's] principal obligation is a monetary obligation." Kan. Stat. Ann. § 84-9-102(a)(61); see, e.g., Aplt. App. 164 ("Payments received by [BCA] under the [BCA Loan] will be held for the benefit of [BCA] and [Participant] until the payments are actually paid to and received by the [Participant]."). Thus, the district court improperly focused on the form of the

-21-

agreements and erroneously concluded that Participants' security interests are security interests in the FLAC stock. The Participation Certificates granted Participants security interests in payment and general intangibles.

B.    Perfection and Priority

Having concluded that the recharacterized transaction only involves a security interest in a payment intangible (BCA's right to receive payments from BCC under the BCA loan) and a security interest in a general intangible (BCA's security interest in the FLAC stock), we must consider who has priority.

The default rule is that a secured party must file a financing statement to perfect its security interest. See Kan. Stat. Ann. § 84-9-310(a). The filing requirement, however, is subject to numerous exceptions and carve-outs. For example, sales of loans or payment intangibles are generally automatically perfected and filing is not required. See id. §§ 84-9-309(3) & (4), 84-9-310(b)(2). Additionally, § 84-9-310(c) provides for automatic perfection where a secured party, like BCA, assigns a perfected security interest.

In this case, the Participants are not perfected pursuant to any of these provisions. To reap the benefits of these provisions there had to be either (a) a true sale, or (b) a true assignment of a perfected security interest. See In re Commercial Money Ctr., 350 B.R. at 485 (holding that, because the underlying transaction was a loan and not a true sale, creditor's interest in a payment

-22-

intangible was not automatically perfected under U.C.C. § 9-309(3)).  Neither

happened in this case.  The former situation never occurred because, as we have

already discussed, the transaction between BCA and the Participants is a loan, not

a sale.  As to the latter of the two situations, the Participants cannot rely on § 84-

9-310(c) because, for the reasons discussed above, BCA granted Participants

security interests in payment and general intangibles, and did not truly assign its

own security interest in FLAC.  And although § 84-9-309(2) suggests that an

assignment of a payment intangible may be automatically perfected when the

assignment does not transfer a significant part of the assignor's outstanding

accounts or payment intangibles, no party has raised this and we decline to

consider it.  Finally, Participants similarly failed to perfect a security interest in a

general intangible—BCA's security interest in the FLAC stock—because filing is

required to perfect that type of interest.  See id. § 84-9-310(a).

We therefore conclude that the underlying transactions granted the

Participants only unperfected security interests.[6]  The record before us makes

clear—and neither party disputes the fact—that Citizens held a perfected security

---

[6]  We also reject the Participants' argument that BCA was precluded, by the express terms of the Participation Certificates, from relinquishing rights in the collateral.  Kan. Stat. Ann. § 84-9-401(b) provides: "An agreement between the debtor and the secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect."  The Participants' remedy may be against BCA for breach, but the transfer was effective.

interest in the FLAC stock.  Accordingly, in this priority dispute over the sale

proceeds of FLAC, Citizens must win.

REVERSED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge